# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 21, 2017          Decided July 6, 2018

No. 16-1328

PENNSYLVANIA STATE CORRECTIONS OFFICERS ASSOCIATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 16-1396

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Michael McAuliffe Miller* argued the cause for petitioner. With him on the briefs was *Edward R. Noonan*.

*Micah P.S. Jost*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney. *Ruth E. Burdick*, Deputy Assistant General Counsel, entered an appearance.

2

Before: HENDERSON, *Circuit Judge*, and WILLIAMS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

GINSBURG, *Senior Circuit Judge*: The Pennsylvania State Corrections Officers' Association (the Employer) petitions for review of an order of the National Labor Relations Board holding it had committed an unfair labor practice by failing to bargain with the Business Agents Representing State Union Employees Association (the Union) before terminating five employees. The Board therefore ordered the Employer to bargain with the Union over the effects of the discharge and to pay back wages to the employees. The parties bargained over the effects to an impasse, but the Board subsequently held it was not a lawful impasse because the Employer sought to bargain about, and reduce, the back pay amount set by the Board. The Board therefore held the Employer was liable for a substantially longer period of back pay. The Employer contends (1) the Board lacks substantial evidence that it failed to bargain over the effects to a lawful impasse, (2) the back pay requirement is arbitrary, capricious, and contrary to law, and (3) one of the five employees is not eligible to receive back pay. The Board cross-appeals for enforcement of the order. We hold the order is not supported by substantial evidence and therefore grant the petition for review, vacate the order, and remand the case to the Board to re-determine the back pay due to each employee.

## I.    Background

The Employer is a union representing approximately 11,000 corrections officers.  It deploys a number of corrections officers, on leave from their jobs with the Commonwealth of Pennsylvania, as "business agents" to represent it in disciplinary matters involving members.  The business agents remain employees of the Commonwealth, which pays their salaries and receives reimbursement from the Employer.  In June 2010, several of the business agents organized their own union (the Union), which then negotiated a collective bargaining agreement with the Employer.

For reasons not relevant here, later in 2010 the Employer terminated five of the business agents.  Four of them returned to the corrections officer positions from which they were on leave during their tenure at the Employer.  The Employer gave each terminated employee one week of severance pay.  The Union filed a complaint with the NLRB alleging the Employer's action violated the National Labor Relations Act because the Employer did not first bargain with the Union over the effects of the terminations.

An Administrative Law Judge conducted a hearing and issued a recommended decision holding the failure to bargain was an unfair labor practice.  *Pa. State Corrections Officers Ass'n and Bus. Agents Representing State Union Emps. Ass'n (PSCOA I)*, 358 NLRB 108, 115 (2011).  He ordered what the Board calls a *Transmarine* remedy, after *Transmarine Navigation Corp.*, 170 NLRB 389 (1968), which required the Employer to do two things.  First, upon request, it had to engage in effects bargaining with the Union.  *PSCOA I*, 358 NLRB at 115.  Second, it had to pay the employees an amount of back pay tied to the pace of the negotiations.  Back pay would begin to accrue "5 days after the date of [the] order" and run until the

Employer and the Union reached "a bona fide impasse in bargaining." *Id.* The ALJ also imposed minimum and maximum amounts; regardless of the amount due under the formula he prescribed, in no event could back pay be "less than the employees would have earned for a 2-week period at the rate of their normal wages when last in [the Employer's] employ" or more than "the amount they would have earned as wages from the date they were discharged to the time they secured equivalent employment elsewhere." *Id.* The remedy also provided that the back pay award was subject to reduction in the amount of "any net interim earnings" the employee received from other work during that period. *Id.* On March 23, 2012 the Board summarily affirmed and issued an order (the "Initial Order") adopting the remedies recommended by the ALJ. *Pa. State Corrections Officers Ass'n and Bus. Agents Representing State Union Emps. Ass'n (PSCOA II)*, 358 NLRB 108, 108-09 (2012).

Soon thereafter the Employer and the Union began bargaining over the effects of the terminations. On April 4, 2012, the Employer offered to pay each of the business agents two weeks of back pay (i) without any reduction for other wages they had earned but (ii) minus the one week of post-termination severance pay each agent had already received and (iii) subject to withholding the other week of back pay as a credit to offset disputed automobile mileage expense payments for which it had reimbursed several of the employees. The Union counteroffered on April 11, demanding "2 weeks' severance pay and all unused leave paid back" for each of the five and reimbursement of additional expenses that one of them claimed. Later the same day the Employer rejected the Union's counteroffer, disputed the vacation time and expense requests, declared the parties at an impasse, and said it would implement its April 4 offer. Thereafter neither party contacted the other, the Employer made no payments to the employees, and the

Union's bargaining authority lapsed when it became defunct on September 28, 2012.

In late 2013 the General Counsel of the Board initiated compliance proceedings against the Employer before the ALJ. The General Counsel claimed the Employer's insistence on a credit against disputed expenses was contrary to the Initial Order, which allowed deductions from back pay only for net wages the employees had earned in other employment. The General Counsel therefore alleged that the Employer had insisted upon an "illegal" topic of bargaining, to wit, offering back pay below the minimum set by the Initial Order, that undercut the validity of the April 11 impasse. The Employer acknowledged that during the bargaining it had "identified the sum which it intended to pay as a *Transmarine* remedy and offset that against previously improperly paid benefits." Nonetheless it moved to dismiss the compliance proceeding on the ground that it had complied with the Initial Order by bargaining to a bona fide impasse with the Union. It also argued that one employee, Mr. Bill Parke, was not entitled to any back pay because he had decided not to return to his job as a corrections officer, and therefore had failed to mitigate his losses. While the compliance case was pending before the ALJ, the parties stipulated that the Employer and Union reached an impasse in bargaining on April 11, 2012.

Following a hearing, the ALJ issued a recommended decision concluding the Employer had not complied with the Initial Order. *Pa. State Corrections Officers Ass'n and Bus. Agents Representing State Union Emps. Ass'n (PSCOA III)*, 364 NLRB No. 108, 2014 WL 2194809 (May 23, 2014). He found "the Board's order required a minimum of two weeks of back pay," the Employer "offered two weeks of back pay, but required that there be a set off against that amount," thereby "[i]nsist[ing] to impasse on a position that derogates from a

specific Board remedy" and was therefore "an illegal subject of bargaining." *Id.* at 12. "At the least, such a position does not constitute a mandatory subject, about which the other party must bargain." *Id.* He therefore concluded "that the impasse of April 11 was not a valid impasse and the back pay period continued to run thereafter" until September 28, 2012, when the Union lost its bargaining authority; hence the back pay period was 26 weeks. *Id.* With regard to Parke, the ALJ found he failed to mitigate his lost wages by not returning to his position as a corrections officer, which the ALJ regarded as equivalent to his position as a business agent because the two were "intrinsically intertwined." *Id.* He therefore ordered the Employer to pay Parke the minimum two weeks of back pay. *Id.* at 13.

Both the Employer and the General Counsel of the Board filed exceptions to the recommended decision. The Employer challenged all the ALJ's findings and conclusions save those related to Parke, which the General Counsel challenged.

In 2016 the Board issued, over Commissioner Miscimarra's partial dissent, a Supplemental Decision and Order adjudicating the compliance case. *Pa. State Corrections Officers Ass'n and Bus. Agents Representing State Union Emps. Ass'n (PSCOA IV)*, 364 NLRB No. 108, 2016 WL 4582492 (Aug. 26, 2016). The Board and the dissenter agreed the *Transmarine* remedy was mandated by the Board, and therefore a topic over which the parties could not bargain. *Id.* at 3; *id.* at 6 (Miscimarra, Comm'r, dissenting). The Board found the Employer had attempted to "bargain about the *Transmarine* backpay remedy"; because "from the outset, the [Employer had] proposed reducing the *Transmarine* amount," it "in effect demanded a modification of the *Transmarine* remedy." *Id.* at 3-4. From these facts the Board concluded the Employer "never made a proposal that met its effects-

bargaining obligation" and therefore did not reach a lawful impasse. *Id.* at 3-4. It also held that, "even if the [Employer] was permitted to bargain over the Board's *Transmarine* back pay remedy," its "insistence to impasse on treating 1 week of *Transmarine* back pay as a credit ... was impermissible" because "the *Transmarine* remedy ... requires the [Employer] to pay employees a minimum of 2 weeks' back pay minus only interim earnings." *Id.* at 4. "In sum, in the effects bargaining, the [Employer] was not entitled to demand that the *Transmarine* remedy be reduced from 2 weeks of backpay to 1 by claiming the second week as a credit." *Id.*

Commissioner Miscimarra interpreted the Employer's offer as being more generous than required by *Transmarine*, wherefore he would have held the impasse was reached lawfully. *Id.* at 6-9. He did so in part because "the *Transmarine* backpay order provided that 'net interim earnings would be deducted from the gross amount of backpay'" whereas the Employer "offered the affected employees 'two weeks pay *without deductions for interim earnings.*'" *Id.* at 9 (quoting the record). He also would have credited the parties' stipulation that the Employer and the Union had bargained to impasse. *Id.* at 7-8.

The Board unanimously reversed the ALJ's findings and conclusions regarding Parke. Applying Board precedents under which the equivalence of two jobs is determined by comparing pay, working conditions, and duties, the Board found Parke's blue collar corrections officer position was not equivalent to his white collar union job, citing in particular the differences in pay and in the duties of the jobs. *Id.* at 5. The Board therefore held Parke had not failed to mitigate and was entitled to the same back pay award – 26 weeks of pay minus net interim earnings – as the other employees. *Id.*

## II.   Analysis

This court "will uphold a decision of the Board unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *E.I. DuPont de Nemours & Co. v. NLRB*, 682 F.3d 65, 67 (D.C. Cir. 2012); *see* 29 U.S.C. § 160(f).  When reviewing the Board's factual findings, we must determine whether "the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  We will affirm the legal conclusions of the Board so long as they are not arbitrary and capricious.  *See Mail Contractors of Am. v. NLRB*, 514 F.3d 27, 31, 34-36 (D.C. Cir. 2008).

The Employer challenges three aspects of the Supplemental Order.  First, it argues there is not substantial evidence to support the Board finding that the parties did not reach a lawful impasse on April 11.  Second, it argues the Supplemental Order is arbitrary and capricious because it impermissibly intrudes into the substantive aspects of the bargaining, confuses the procedural requirement to bargain with a substantive requirement to offer specific terms, and constitutes a fine that exceeds the Board's remedial authority under Section 10(c) of the Act, 29 U.S.C. § 160(c).  Third, it argues the Board erred when it found Parke eligible to receive the full award of back pay, which we interpret as an argument that there is not substantial evidence to support that finding.

### A.   Substantial Evidence

The Employer argues there is not substantial evidence to support the Board's findings concerning the validity of the

impasse and the associated *Transmarine* remedy. The Board argues preliminarily that we lack jurisdiction to hear the argument because it "did not appear in the [Employer's] filings with the Board." It argues in the alternative that it "reasonably found" the parties did not reach a lawful impasse.

### 1. Jurisdiction

The Board's jurisdictional objection is that the Employer never urged the substantial evidence argument before it. Section 10(e) of the Act bars us from considering any "objection that has not been urged before the Board ... unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982).

The Board argues, following *Alden Leeds, Inc. v. NLRB*, 812 F.3d 159, 167-68 (D.C. Cir. 2016), that "section 10(e) bars review of any issue not presented to the Board, even where the Board has discussed and decided the issue." It claims the Employer did not raise any of its present arguments, including the substantial evidence challenge, at any point before the Board. The Employer argues it had properly raised the argument in its exceptions and that, as in *Trump Plaza Associates v. NLRB*, 679 F.3d 822, 830 (D.C. Cir. 2012), these exceptions "sufficiently apprised [the Board], for the purpose of section 10(e)," of its objection that there is not substantial evidence to support the Board's findings.

In assessing a claim of forfeiture under § 10(e), "the critical question is whether the Board received adequate notice of the basis for the objection." *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1090 (D.C. Cir. 2016) (cleaned up). "Although briefing and argument before the Board are desirable ... section

10(e) does not require such procedures." *Local 900, Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO v. NLRB*, 727 F.2d 1184, 1192 (D.C. Cir. 1984). An appellant may adequately notify the Board of the basis for its objection by "articulating [it] in its exceptions to the ALJ's decision." *Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162, 1175 (D.C. Cir. 1993); *see Consol. Freightways v. NLRB*, 669 F.2d 790, 793 (D.C. Cir. 1981). That is precisely what happened here. For the obverse situation, see *BPH & Co. v. NLRB*, 333 F.3d 213, 219-220 (D.C. Cir. 2003) (holding a petitioner satisfied § 10(e) by briefing an argument before the Board despite it's not having been in the petitioner's exceptions).

Two exceptions the Employer put before the Board are pertinent. First, the Employer excepted "[t]o the ALJ's finding that [its] position ... was contrary to the minimum back pay remedy in the Board's [Initial] Order." Second, the Employer excepted "[t]o the ALJ's failure to find that ... the Board's [Initial] Order in the underlying case tolled back pay at the point that the parties were at a lawful impasse, e.g. on or before April 11, 2012." It did not repeat either point in its brief before the Board.

We need not debate whether, in the abstract, these exceptions provided adequate notice to the Board; we know they did because the Board addressed them in the Supplemental Order. First, the Board said it "affirm[ed] the [ALJ's] finding that the parties' April 11, 2012 impasse was not a lawful impasse and therefore did not toll the back pay period." *PSCOA IV*, 364 NLRB No. 108, at 3. It explained that the Initial Order required the Employer to "(1) bargain over the effects of the [termination], and (2) give affected employees 'limited backpay' for a period beginning 5 days after the date of the Board's Order and ending at the earliest" of several enumerated conditions. *Id.* It found the Employer had

"propos[ed] during effects bargaining that the parties bargain about the *Transmarine* backpay remedy" and "insist[ed] to impasse on its offer to the Union of 'backpay … for a 2-week period' with 1 week's pay deducted … and the other 1 weeks' pay treated as a credit." *Id.* The Employer "in effect demanded a modification of the *Transmarine* remedy" because "from the outset, the [Employer] proposed reducing the *Transmarine* amount" and as such it "never made a proposal that met its effects-bargaining obligation." *Id.* at 3-4. Second, the Board said the Employer's back pay proposal was "impermissible" because "in the effects bargaining, the [Employer] was not entitled to demand that the *Transmarine* remedy be reduced from 2 weeks of backpay to 1 by claiming the second week as a credit." *Id.* at 4.

The Board thus responded to – and thereby acknowledged its awareness of – both the relevant exceptions. Under our precedents, this is sufficient to satisfy Section 10(e). *See BPH & Co.*, 333 F.3d at 220 (holding petitioner had "adequately apprised the Board" of an argument, and therefore "compl[ied] with section 10(e)," because it had briefed the argument before the Board and the Board had "acknowledged" as much in the order under review). Moreover, because the arguments were properly presented to the Board, *Alden Leeds* is inapposite and the Board's reliance upon it is misplaced.

Our dissenting colleague would hold we do not have jurisdiction to consider the Employer's substantial evidence argument for two reasons. First, she would hold the Employer did not use the words "gross" and "net" in its exceptions before the Board, and therefore did not state its objection with the necessary precision. Dissenting Op. at 8 ("[T]he Employer nowise made the specific point that one week's gross unearned wages exceeded two weeks of net pay and *ipso facto* produced a lawful impasse."); *see id.* at 1, 6, 9. Second, she would hold

the argument forfeit because it was not properly presented to us. *See id.* at 9-11.

Regarding the former objection, we have never before required a litigant to frame a challenge to a finding of the Board with such precision. On the contrary, "we have not required that the ground for the exception be stated explicitly in the written exceptions filed with the Board" so long as "the ground for the exception [is] evident by the context in which the exception is raised." *Trump Plaza Assocs.*, 679 F.3d at 829 (Henderson, J.) (cleaned up) (*quoting Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 417 (D.C. Cir. 1996)). Nor have we required a litigant to state a substantial evidence objection with great precision; for example, we have deemed sufficient an argument merely implied by the arguments actually presented to the Board. *See id.* at 830 (holding Section 10(e) satisfied because the argument made before the Board "necessarily includes" the argument made on appeal); *BPH & Co.*, 333 F.3d at 220 (Henderson, J.) (holding a substantial evidence objection satisfied Section 10(e) "notwithstanding its not being addressed expressly to the conduct alleged" in a settlement agreement the Board cited as evidence of an unfair labor practice). Therefore under our precedents the Employer's exception to the specific Board finding that it was not "at a lawful impasse ... on or before April 11," for the specific reason that its bargaining position was not "contrary to the minimum back pay remedy in the Board's [Initial] Order," was more than sufficient.

Regarding the latter objection, our dissenting colleague scrutinizes the Employer's brief and finds only two "bare assertions" and no legal reasoning. Dissenting Op. at 9. We find much more there: In a section that begins with the heading "The NLRB's findings of fact are not supported by substantial evidence on the record as a whole," the Employer argues it

"made a lawful severance pay proposal during effects bargaining" and "never attempted to negotiate downward the Board-ordered backpay remedy." In the following three paragraphs, the Employer argues "the Board majority's conclusion that [the Employer] merely attempted to negotiate downward the Board-ordered backpay remedy is not supported by substantial evidence on the record as a whole," "the Union plainly did not view [the Employer's] proposal as an attempt to negotiate down the Board-ordered remedy," the Employer "complied [with] the effects bargaining order and negotiated to a lawful, stipulated impasse in good faith," and "[t]he Board's findings to the contrary must be reversed." That is enough for us.

### 2. Merits

Satisfied that the argument is properly before us, we turn to the Employer's claim there is not substantial evidence to support the Board's finding that the Employer and the Union did not reach a lawful impasse on April 11, 2012. Notwithstanding the Employer's representation to the ALJ and the Board that its offer to the Union concerned severance pay, the Board found the Employer sought "to bargain to impasse about *Transmarine* backpay" and "in effect demanded a modification of the *Transmarine* remedy" by "demand[ing] that the *Transmarine* remedy be reduced from 2 weeks of backpay to 1." The Employer argues it "never attempted to negotiate downward the Board-ordered back pay remedy," which it acknowledges "the parties cannot modify," and that its offer "exceeded the minimum *Transmarine* requirement."

Therefore the critical question is whether substantial evidence supports the Board finding that the Employer bargained about the *Transmarine* remedy, and more specifically whether in the course of any such bargaining the

Employer sought the Union's agreement to accept less than the *Transmarine* amount the Board specified in the Initial Order. If the record were unambiguous on this point, perhaps it would be sufficient to rely, as does our dissenting colleague, solely upon a semantic analysis of the terms offered in the course of negotiations.[1]   Here, because the Board's finding is a mathematical proposition, namely that the Employer sought to pay less than the *Transmarine* amount set by the Board, a quantitative analysis is more appropriate.  If the Employer offered to pay more than the *Transmarine* amount, then it complied with the Initial Order.  If it offered to pay less, then it did not.  An offer to pay employees back pay equal to twice the *Transmarine* amount is not an attempt to negotiate about the *Transmarine* amount; rather, it is an offer to pay the *Transmarine* amount, as required, and a substantial increment on top of that.

What, then, was the *Transmarine* amount?   The *Transmarine* back pay period began on March 28, 2012, five days after entry of the Initial Order.  *See PSCOA I*, 358 NLRB at 109, 115.  As of April 11, 2012, when the parties reached an impasse in bargaining, the *Transmarine* back pay period was 14 days.  Therefore the formula fixed the *Transmarine* amount

---

[1] Our colleague asserts that (1) her analysis is "substantive," not semantic, because she would "hold the Employer to the precise meaning of the technical term[]" it used in its offer, *i.e.*, back pay, and (2) "severance pay and backpay are different things."  Dissenting Op. at 13 n.3, 16-17 n.5.  We are unconvinced for two reasons.  First, discerning "the precise meaning" of a word is the very archetype of a semantic analysis.  Second, because "severance payments may be deducted from an employer's backpay obligation," *id.* at 13 n.3 (*citing W.R. Grace & Co.*, 247 NLRB 698, 699 n.5 (1980)), severance pay and back pay are not distinct when, as here, the severance pay disbursed by the Employer may be credited toward its back pay obligation.

at two weeks' wages, net of any other earnings, which coincidentally was also the minimum *Transmarine* amount imposed by the Board, *viz.*, the amount the employees "would have earned for a 2-week period .... less any net interim earnings." *Id.* Consequently, the Employer was not trying to bargain "about" the *Transmarine* remedy or to "reduce" its *Transmarine* obligation if, as of April 11, it had offered to pay the employees at least two weeks of net wages.

Based upon the record before us, it is clear the Employer had done that and therefore the parties reached a lawful impasse on April 11. The Board focused simply upon the number of weeks of wages required or offered, *i.e.*, two, but as Commissioner Miscimarra recognized in his dissenting opinion, the parties discussed two different measures of wages, gross wages and net wages. On April 11 the Board's *Transmarine* remedy stood at two weeks' net wages. The Employer had offered back pay "for a two week period," which is to say two weeks' *gross* wages, less a deduction for "the one week [of severance] pay" it had already given each of the business agents, with the other week to "act as a credit to reduce the amount" of any improper expense claims it had paid. This distinction between gross and net wages makes all the difference.

Consider the case of Shawn Hood, former president of the Union. The parties stipulated that his salary when he was terminated was $3,194.52 biweekly. After being terminated Hood returned to his position as a correctional officer for the Commonwealth of Pennsylvania. The General Counsel estimated Hood's interim net earnings from his new position were $17,086.90 for the thirteen weeks following his termination, or $2,628.75 biweekly. Therefore the *Transmarine* amount due to Hood – two weeks of Employer salary less two weeks of net interim earnings – is $565.77.

Meanwhile, the Employer offered to pay Hood his "normal wages [at the Employer] *without deducting net interim earnings* [from the Commonwealth] for a 2-week period," which as just explained is $3,194.52. It also noted Hood had already received one week of gross salary, or $1,597.26, as severance pay. The Board readily concedes, citing *W.R. Grace & Co.*, 247 NLRB 698, 699 n.5 (1980), that the Employer could lawfully credit severance pay towards its *Transmarine* obligation.

Therefore, the Employer's offer to pay Hood one week of gross back pay, which he had already received, exceeded the *Transmarine* amount of two weeks of net pay. In other words, the Employer had already satisfied its back pay obligation when negotiations reached an impasse; offering Hood another week of wages, whether as a credit or otherwise, could not violate the back pay provision in the Initial Order. The same is likely true for several, if not all, the other terminated business agents.

Our dissenting colleague does not stop to consider the dollar value of either the Employer's offer or its *Transmarine* obligation but simply interprets the term "back pay" in the offer to mean the amount due under the Board's *Transmarine* remedy. Thus would she find the Employer "bargain[ed] about *Transmarine* backpay instead of severance pay," "insisted to impasse about the form of *Transmarine* backpay," and reached an "impasse on backpay matters." Dissenting Op. at 13 (emphasis omitted). In this telling, "back pay" is synonymous with the *Transmarine* amount and any proposed offset from back pay necessarily means the Employer sought "a more favorable bargain," *id.* at 14, than the *Transmarine* remedy permitted.

A controversy concerning money, if we are to get to the bottom of it, requires of us more than a semantic treatment. So too does the substantial evidence test, which requires us to undertake "a review of the whole record ... tak[ing] into account whatever in the record fairly detracts from the Board's conclusions." *Healthbridge Mgmt., LLC v. NLRB*, 798 F.3d 1059, 1078 (D.C. Cir. 2015) (Henderson, J., concurring in part) (cleaned up). Having made the requisite calculations, which neither the ALJ nor the Board bothered to do, we necessarily conclude there is not substantial evidence to support the Board's finding.

Accordingly, we must vacate the Supplemental Order and remand the case to the Board to assess more carefully whether the Employer's offer to the Union exceeded the *Transmarine* amount. In so doing we leave to the Board the various questions that affect that assessment, such as how to treat the Employer's proposed credit and whether to account for the fact the Employer did not claim Parke owed any disputed mileage.

## B. Arbitrary and Capricious Review

Because we must vacate the Supplemental Order for want of substantial evidence, we have no occasion to consider the Employer's alternative argument that the Supplemental Order is arbitrary and capricious.

## C. Parke's Eligibility for Back Pay

Finally, the Employer challenges the evidentiary support for the Board's finding that Parke did not fail to mitigate his lost wages and therefore is eligible to receive the full award of back pay. Under the Initial Order – the validity of which is not at issue here – Parke is due a minimum of two weeks of net pay. During the compliance case the ALJ found Parke had

failed to mitigate but nonetheless "is entitled to the minimum 2 weeks of back pay set forth in the Board's order in the underlying case." *PSCOA III*, 364 NLRB No. 108 at 13. On appeal the Board found Parke did not fail to mitigate and therefore awarded him the full 26 weeks of back pay. *PSCOA IV*, 364 NLRB No. 108 at 5.

On remand the Board may find the Employer reached a lawful impasse on April 11 and therefore owes each employee only two weeks of back pay. If that occurs, then the question of Parke's mitigation would be moot, as the back pay award due to him – two weeks – might be the same regardless whether he mitigated his lost wages. Under these circumstances, the question whether Parke mitigated his losses is not yet ripe for our review.

### III.  Conclusion

For the reasons set out above, we grant the petition for review, vacate the Supplemental Order, and remand the case to the Board for further proceedings.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting: My colleagues conclude that the Pennsylvania State Corrections Officers Association (Employer) offered its terminated employees "at least two weeks of net wages" as backpay under *Transmarine Navigation Corp.*, 170 NLRB 389 (1968), "and therefore the parties reached a lawful impasse" in effects bargaining. Maj. Op. 15. I see two problems with this conclusion. First, it relies on an argument the Employer never made: that for each employee, "one week of gross salary" "likely" "exceeded the *Transmarine* amount of two weeks of net pay." Maj. Op. 16. Second, the Employer's payment of two weeks' backpay did not *ipso facto* mean that the parties reached a lawful impasse or even that the Employer satisfied its full backpay obligation, which exceeded two weeks if no lawful impasse was reached until later. In my view, even assuming the Employer paid its terminated employees two weeks of backpay by virtue of one week's gross wages, substantial evidence demonstrates that there was no lawful impasse within two weeks. Indeed, as I read the record, the National Labor Relations Board (Board) reasonably found that the backpay period ran for *twenty-six* weeks. I would enforce its decision and deny the Employer's petition for review.[1] Accordingly, I respectfully dissent.

## I.  BACKGROUND

The majority opinion recounts much of the relevant background. But it downplays circumstances that, to my mind, illuminate the problems mentioned above. I therefore summarize what I believe to be the factual and legal highlights.

---

[1] My colleagues do not pass upon the Employer's claim that one of the discharged employees, Bill Parke, is ineligible for backpay. Maj. Op. 17-18. For that reason, I spill no ink on the matter except to note that I discern no basis for disturbing the Board's finding that Parke is eligible.

## A.  BARGAINING ORDER

The Employer discharged five of its business agents.   At the time, it paid them one week's wages it later characterized as unearned.   But it did not bargain about the effects of the discharges with the business agents' collective-bargaining representative, the Business Agents Representing State Union Employees Association (Union).   As no one now disputes, the discharges were lawful but the failure to bargain beforehand about their effects violated the National Labor Relations Act (Act).

The Administrative Law Judge (ALJ) recommended that the Board remedy the violation by (1) ordering the Employer to bargain with the Union about the effects of the discharges and (2) requiring the Employer to pay backpay per *Transmarine*.   The Board adopted both components of the ALJ's recommended remedy.   As to the second component, the Board ordered the Employer to pay the discharged business agents "backpay at their normal wages from 5 days after the date of this order until the earliest of the following conditions": an agreement in effects bargaining; "a bona fide impasse in bargaining"; the Union's failure to bargain in a timely fashion; or the Union's failure to bargain in good faith.   358 NLRB 108, 115 (2012); *see id.* at 109.   "[I]n no event," however, was the backpay amount to be less than two weeks' wages minus any interim earnings.   *Id.* at 115; *see* NLRB Casehandling Manual, Pt. 3, Compliance Proceedings § 10528.7 (July 2017) (enumerating standard conditions of *Transmarine* backpay), perma.cc/D89T-LC4A.

I pause here to point out that *Transmarine* backpay is not an end in itself.   It is "designed to restore at least some economic inducement for an employer to bargain" about the effects of terminating its employees even after it terminates

3

them.  *O.L. Willis, Inc.*, 278 NLRB 203, 205 (1986); *see Kirkwood Fabricators, Inc. v. NLRB*, 862 F.2d 1303, 1307 (8th Cir. 1988) (backpay restores "bargaining strength" employees "would have had" absent employer's violation); *Yorke v. NLRB*, 709 F.2d 1138, 1145 (7th Cir. 1983) (it "create[s] an incentive for the [employer] to bargain in good faith" and "discourage[s] premature impasse").  In *Transmarine*, the employer violated the Act by closing a facility without bargaining over the closure's effects on employees.  170 NLRB at 389.  The Board reasoned that "a bargaining order alone cannot serve as an adequate remedy" for such a violation after "the collective strength of the employees' bargaining unit [has] dissipated."  *Id*. at 389-90.  Accordingly, and on the theory that the wrongdoing employer, not his employees, "should bear the consequences of his unlawful conduct," the Board devised the backpay requirement "to recreate in some practicable manner a situation in which the parties' bargaining position is not entirely devoid of economic consequences for" the employer.  *Id*.

## B.  EMPLOYER'S ATTEMPT AT EFFECTS BARGAINING

Effects bargaining typically involves "things like severance packages, neutral recommendation letters, or benefits payouts." *Fallbrook Hosp. Corp.*, 360 NLRB 644, 655 (2014), *enforced*, 785 F.3d 729 (D.C. Cir. 2015); *see Sea-Jet Trucking Corp.*, 327 NLRB 540, 540 (1999) (it can involve "moving expenses" and "transportation costs"), *enforced*, 221 F.3d 196 (D.C. Cir. 2000) (unpublished table decision); *Times Herald Printing Co.*, 315 NLRB 700, 702 (1994) (it can involve "pension fund payments, health insurance coverage and conversion rights").  In this case, by contrast, the Employer sought to bargain about the particulars of *Transmarine* backpay *itself*.

4

On April 4, 2012,[2] representatives of the Employer and the Union met to bargain. Counsel for the Employer memorialized the meeting. Joint Appendix (JA) 213-14. According to his memorandum:

- The Employer reminded the Union that it had paid the business agents one week's unearned wages when it discharged them. JA 214.

- The Employer also asserted that the business agents had for years collected "invalid and unsubstantiated mileage reimbursement[s]." *Id.*

- The Employer offered to pay two weeks of backpay in the form of two separate one-week setoffs. *Id.* It proposed to treat the unearned wages it had paid at the time of discharge as one week of backpay. *Id.* And it proposed to "credit" the second week of backpay by deducting its amount from whatever the Employer might seek in a civil suit claiming the business agents had collected "invalid and unsubstantiated mileage." *Id.*

Counsel sent the Union an offer letter to the same effect, noting further that the Employer proposed to pay the two weeks of backpay "without deducting [any] net interim earnings for [that] period." JA 222 (emphasis omitted).

By letter on April 10, the Union protested any setoff for mileage, claiming there was no proof the reimbursements were invalid. The Union made a counteroffer seeking, for each business agent, two weeks' severance pay plus compensation for unused leave. On April 11, the Employer rejected the

---

[2] Specific dates mentioned in this opinion were in 2012.

Union's counteroffer, unilaterally declared impasse and "implement[ed]" the aforementioned setoffs against two weeks of backpay. JA 225. The Employer and the Board General Counsel later stipulated that the Employer and Union "reached an impasse" on April 11, insofar as neither side ever contacted the other "to engage in further bargaining." JA 252; *see* JA 69-70 (Union vice president testified that, because Employer had effectively said "'This is it,'" Union "was left with nothing to bargain for"). On September 28, the Union went defunct and was no longer available to bargain.

## C. COMPLIANCE PROCEEDING

The Board Regional Director initiated a compliance proceeding, alleging that no condition for ending the backpay period had ever occurred: the parties never reached an agreement or lawful impasse and the Union timely bargained in good faith. Therefore, according to the Regional Director, the backpay period ran for twenty-six weeks: from March 28 (five days after the Board's bargaining order) until September 28 (the first day the Union was no longer available to bargain).

In response, the Employer asserted that the parties reached a lawful impasse on April 11 and, thus, the backpay period ran for exactly two weeks (from March 28 to April 11), not twenty-six. The Employer did not support that assertion with any meaningful argument. As relevant here, it did not allege that, standing alone, the one week of unearned wages it had already paid the business agents "exceeded the *Transmarine* amount of two weeks of net pay." Maj. Op. 16. Much less did it claim that the unearned wages, standing alone, satisfied its *bargaining* obligation. Maj. Op. 13-17.

The ALJ held an evidentiary hearing. At the outset, he asked the Employer whether it had "insisted . . . to the point of impasse" on the setoff for mileage reimbursements. JA 45.

The Employer answered: "It was certainly part of the impasse, Yes, Your Honor." JA 46. The ALJ asked the Employer whether it was arguing that the setoff was "a mandatory subject" on which it could properly insist to impasse. *Id*. "That's right," the Employer responded. *Id*.

The ALJ issued a recommended decision concluding that the Employer "derogate[d] from" the Board's bargaining order in insisting to impasse on the setoffs for unearned wages and mileage reimbursements. JA 309. The ALJ found that the setoffs against backpay were not mandatory subjects about which the Union was required to bargain. *Id*. Thus, in the ALJ's view, the Employer "poisoned the well by insisting on improper conditions" and "the impasse of April 11 was not a valid impasse and the back pay period continued to run thereafter." *Id*.

The Employer filed exceptions to the ALJ's decision. It argued that the ALJ erred in finding that the setoffs were "contrary to the minimum back pay remedy in the Board's [o]rder." JA 273. Again, however, it did not contend that, standing alone, the one week of unearned wages it had already paid the business agents "exceeded the *Transmarine* amount of two weeks of net pay," Maj. Op. 16, and *ipso facto* satisfied its bargaining obligation, Maj. Op. 13-17. Nor did it advance any such contention in its supporting brief to the Board. Rather, the Employer again argued simply that its proposed setoffs against *Transmarine* backpay were subjects on which it could properly insist to impasse and that, accordingly, there was a lawful impasse on April 11.

Over a dissent, the Board affirmed the ALJ's findings that there was no lawful impasse on April 11 and that "the backpay period ran for 26 weeks, from March 28 to September 28." 364 NLRB No. 108, at 3 (2016). In the Board's view, the

Employer "conflated" its bargaining obligation with its backpay obligation in "bargain[ing] about the *Transmarine* backpay remedy" instead of severance pay and other mandatory subjects. *Id*. Indeed, the Board concluded that the Employer improperly *insisted to impasse* on subjects related to backpay, "defeat[ing] the purpose of the remedy." *Id*. The end result was that the Employer "never made a proposal that met its effects-bargaining obligation." *Id*. at 4.

As an alternative holding, the Board found that "even if the [Employer] was permitted to bargain over the Board's *Transmarine* backpay remedy," it could not insist to impasse on a one-week setoff for mileage reimbursements. 364 NLRB No. 108, at 4. The Board reasoned that, in seeking such a "credit" against a potential award "in a private lawsuit," the Employer "in effect demanded a modification of the *Transmarine* remedy." *Id*. (citing, *inter alia*, *The State Journal*, 238 NLRB 388, 388 (1978), which had held that backpay "is not a private right but is a public right granted to vindicate" "the public interest in preventing and deterring unfair labor practices").

## II. ANALYSIS

The procedural road was long and winding but the questions before us are straightforward. Did the Employer satisfy its bargaining obligation? That is, did it bargain to a lawful impasse? And if not, how many weeks of backpay does it owe? In my view, substantial evidence supports the Board's answers to these questions: no, no and twenty-six weeks, respectively. My colleagues conclude otherwise because, by their calculations, the unearned wages the business agents received at the time of discharge exceeded two weeks of net pay and so produced a lawful impasse. But the Employer

forfeited that argument, which cannot support vacatur in any event.

## A. FORFEITURE

My colleagues observe that an employer "may adequately notify the Board of the basis for its objection by articulating it in its exceptions to the ALJ's decision." Maj. Op. 10 (brackets and internal quotation omitted). That is true as far as it goes but it does not go far. The exceptions must be "sufficiently specific to apprise the Board that an issue might be pursued on appeal." *Trump Plaza Assocs. v. NLRB*, 679 F.3d 822, 829 (D.C. Cir. 2012) (internal quotation omitted); *see Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 417 (D.C. Cir. 1996) ("[T]he ground for the exception [must] be evident by the context in which [it] is raised." (internal quotation omitted)). In the exceptions on which my colleagues rely, the Employer nowise made the specific point that one week's gross unearned wages exceeded two weeks of net pay and *ipso facto* produced a lawful impasse. Nor did the Employer's supporting brief supply any argument or authorities to that effect. *Cf. Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1090-91 (D.C. Cir. 2016) ("Companies' written exceptions and supporting briefs together preserved their argument" because, *inter alia*, briefs included on-point argument heading and additional statements that "apprised the Board").

My colleagues take pains to note that, in decisions I have participated in, we have not "required a litigant to state a substantial evidence objection with great precision." Maj. Op. 12 (citing *Trump Plaza* and *BPH & Co. v. NLRB*, 333 F.3d 213, 220 (D.C. Cir. 2003)). I have not forgotten. The Employer, however, was not simply imprecise. Nor did it merely omit magic words like "gross" and "net." Rather, it utterly failed to suggest to the Board, in any form or fashion, that payment

of one week's unearned wages fully satisfied its bargaining and backpay obligations. Indeed, I am confident the argument never so much as dawned on the Employer. Had the Employer thought one week's unearned wages, standing alone, fully satisfied its obligations, it would have had no need to propose—let alone *insist on*—a second week's setoff for mileage reimbursements.

My colleagues conclude that, even if the exceptions were not sufficiently specific "in the abstract," they must have "provided adequate notice to the Board" because "the Board addressed them." Maj. Op. 10. I disagree. Yes, the Board addressed and denied the *exceptions*, such as they were: it found that there was no lawful impasse on April 11 because the Employer "demanded a modification of the *Transmarine* remedy" instead of making "a proposal that met its effects-bargaining obligation." 364 NLRB No. 108, at 4. But the Board did not consider—because the Employer did not raise—any argument that one week's unearned wages, standing alone, exceeded two weeks of net pay and so produced a lawful impasse.

For that matter, the Employer does not sufficiently preserve any such argument in this Court. The closest it comes are two bare assertions, nine pages apart, that it "offered two weeks['] pay without deductions for interim earnings," Pet'r's Br. 37 (internal quotation and emphasis omitted), and that the offer "exceeded the minimum requirement of *Transmarine*," Pet'r's Br. 28. Such disjointed statements—adorned by no analysis of their legal significance—does not a reasoned contention make. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." (internal quotation omitted)); *Seattle Opera v. NLRB*, 292 F.3d 757, 764

n.8 (D.C. Cir. 2002) (party does not preserve argument by mentioning fact without explaining its "*legal* significance"); *see also Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) ("[J]udges are not like pigs, hunting for truffles buried in briefs or the record[.]" (internal quotation omitted)).

My colleagues point to the Employer's assertion that it "made a lawful severance pay proposal." Maj. Op. 13 (quoting Pet'r's Br. 36). But the Employer's assertion that it offered severance pay is not an argument that one week's unearned wages satisfied the backpay obligation, much less an argument that satisfying the backpay obligation automatically produced a lawful impasse. *See infra* note 3 (severance pay and backpay are distinct). Nor does the Employer preserve the argument by claiming it "never attempted to negotiate downward the Board-ordered backpay remedy." Maj. Op. 13 (quoting Pet'r's Br. 36). As best I can tell from the Employer's briefing—which is, at minimum, opaque—that claim is another way of saying only that the two setoffs *together* permissibly equalled two weeks' backpay.

Oral argument was especially illuminating. Counsel for the Employer did not himself plow the ground in which the majority plants vacatur. Instead, when prodded about whether the record contains "any indication" that the one week of gross unearned wages "was less than the two weeks' net pay required by *Transmarine*," counsel responded: "You're right, Your Honor, I don't believe that that's in the record." Oral Arg. Recording 6:10-6:37. Counsel noted that this was a point the dissenting Board member made, *id*. at 7:03-7:07, and he "agree[d]" with it, *id*. at 7:07-7:10, 8:01-8:09. But counsel never said anything else about it, which is unsurprising given that it does not appear in the briefs. And because it does not appear in the briefs, Board counsel was understandably gobsmacked. *Id*. at 24:19-24:35 ("It's, um, it's an interesting

argument, Your Honor, and it's an argument that should've been placed before the Board. . . . I don't read [the] exception[s] as remotely raising the issue that you're describing here."); *id.* at 25:16-25:28 ("They certainly didn't elaborate on it in any way that put the Board on notice. . . . And that's why the subject hasn't been briefed or argued in any sort of detail before the Court.").

**B. MERITS**

Preserved or not, the argument my colleagues endorse lacks merit. I do not disagree with their calculations; I assume arguendo that the Employer in effect paid the business agents two weeks' net backpay when, at the time of discharge, it paid them one week's gross wages. Maj. Op. 14-16. To me, however, it does not follow that the Employer and Union "therefore" reached a lawful impasse. Maj. Op. 15.

As an initial matter, I am not sure why my colleagues treat the "*Transmarine* amount" as though it were a set amount the bargainers knew with exactitude *ex ante*. *See, e.g.*, Maj. Op. 13-14 (focusing on "whether in the course of . . . bargaining the Employer sought the Union's agreement to accept less than the *Transmarine* amount"). Recall that, under the bargaining order, the backpay period ran from March 28 "until the earliest of the following conditions": an agreement, a lawful impasse or the Union's failure to bargain in a timely fashion or in good faith. 358 NLRB at 115. In the usual case, I doubt the parties know at the time of bargaining how long the backpay period will last—and thus how much backpay the employer will owe—because they do not know with precision when there will be an agreement, a lawful impasse or a failure to timely bargain in good faith.

Here, by contrast, the Employer predetermined a few days into the bargaining process that the backpay period was going

to cover exactly two weeks. JA 214 (April 4 memorandum of Employer's counsel referred to "the two week backpay period"). And sure enough, exactly two weeks into the period, the Employer unilaterally declared an impasse. JA 225 (April 11 letter to Union). None of this was "coincidental[]." Maj. Op. 15. It neatly dovetailed with the bargaining order's proviso that "in no event" was the amount of backpay to be less than two weeks' wages minus any interim earnings. 358 NLRB at 115.

My colleagues see no problem with this tactic. Apparently, what matters to them is that the Employer met the backpay amount it effectively set for itself in declaring impasse. Again, I disagree. The key question is whether the impasse was lawful. As I understand the majority's reasoning:

➢ The April 11 impasse was lawful because the Employer paid two weeks of backpay.

➢ The backpay period lasted two weeks because the parties reached a lawful impasse on April 11.

This circular logic unravels if in fact the backpay period lasted longer than two weeks. And the backpay period *did* last longer than two weeks if the April 11 impasse was not lawful—or not "bona fide," to use the terms of the bargaining order. 358 NLRB at 115. To me, the lawfulness of the impasse does not turn on whether and to what extent the Employer offered or paid *backpay*, *contra* Maj. Op. 14 (theorizing that "[i]f the Employer offered to pay more than the *Transmarine* amount, then it complied with the [bargaining order]," no further questions asked). Instead, it turns on whether the Employer made any offer that met its antecedent obligation "to *bargain*

with the Union" about "the effects of its decision to discharge employees." 358 NLRB at 115 (emphasis added).

I agree with the Board that the Employer never made such an offer. 364 NLRB No. 108, at 4. As the Board explained, *id*. at 3, the Employer "conflated" its bargaining obligation with its backpay obligation by bargaining about *Transmarine* backpay instead of severance pay and other mandatory subjects. Indeed, as the Employer admitted to the ALJ, it *insisted to impasse* about the form of *Transmarine* backpay. JA 45-46 (when ALJ asked Employer whether it "insisted upon" mileage setoff "to the point of impasse," Employer said "[i]t was certainly part of the impasse, Yes, Your Honor"). This impasse on backpay matters defeated backpay's very purpose: to induce the Employer to bargain about severance pay, unused leave and other benefits—not backpay itself.[3] *O.L. Willis*, 278 NLRB at 205; *Transmarine*, 170 NLRB at 389-90; *see Kirkwood Fabricators*, 862 F.2d at 1307; *Yorke*, 709 F.2d at 1145; *see also supra* pp. 2-3.

---

[3] Lest there be confusion, severance pay and backpay are different things. As the Board explained, severance is paid "*in addition* to *Transmarine* backpay." 364 NLRB No. 108, at 3. The Board provided the following illustration: "At the end of 3 weeks of effects bargaining pursuant to *Transmarine*, a union and a respondent agree to 1 week's severance pay. The discriminatees will receive 1 week's severance pay *and* 3 weeks' *Transmarine* backpay." *Id*. at 3 n.7. Granted, severance payments may be deducted from an employer's backpay obligation because the Board treats such payments as "interim earnings." *W.R. Grace & Co.*, 247 NLRB 698, 699 n.5 (1980). But neither the Employer nor the majority cites any law suggesting that effectively *paying* backpay via a severance deduction satisfies an employer's obligation to *bargain* about severance and related matters.

The Employer's own litigating position should have doomed its case. Before both the ALJ and the Board, the Employer argued that *Transmarine* backpay—or, more precisely, the manner in which it was to be paid—was a mandatory subject on which the Employer could properly insist to impasse. JA 45-46, 287. The Board rejected that argument, 364 NLRB No. 108, at 3, and for good reason. Mandatory subjects are "matters that vitally affect wages, hours, and other terms and conditions of employment." *Cushman & Wakefield, Inc.*, 360 NLRB 42, 45 (2013) (internal quotation omitted). Backpay is not such a subject but a *remedy* that enables effective bargaining *about* such subjects. It is common sense, really. Ordinarily an employer must provide "notice and an opportunity to bargain" about vital terms and conditions before or contemporaneously with a change in those terms and conditions. *Washoe Med. Ctr., Inc.*, 337 NLRB 202, 202 (2001); *see, e.g.*, *Transmarine*, 170 NLRB at 389 (employer violated Act by closing facility without timely bargaining over closure's effects on employees). Here, before the discharges, no backpay requirement yet existed because the Employer had not yet violated the Act. Because the point of backpay is to "restore[]" the "status quo ante with respect to bargaining power," *Times Herald Printing Co.*, 315 NLRB 700, 702 (1994), and because backpay is not a subject (mandatory or otherwise) of bargaining *before* a violation, the Employer cannot be permitted to use it as a negotiating chip *after* a violation, thereby striking a more favorable bargain precisely because the Employer violated the Act.

Retreating from the position it staked out before the Board, the Employer told us at oral argument that backpay—or at least a mileage setoff for backpay—is a *permissive*, not mandatory, subject of bargaining. Oral Arg. Recording 11:05-11:34. This was a crucial change in stance given that "[i]nsistence upon matters not within the scope of mandatory bargaining as

a condition to any agreement constitutes a refusal to bargain in good faith." *Teamsters Local Union No. 515 v. NLRB*, 906 F.2d 719, 723 n.3 (D.C. Cir. 1990) (citing *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958)). To sum up, the Employer admitted to the ALJ that it insisted to impasse on a mileage setoff. It then admitted to us that it could not properly insist to impasse on a mileage setoff. Case closed, it seems to me.[4]

Still, while I am on the subject of the Employer's litigating position, I make a final observation for the sake of completeness: the arguments the Employer advances in this Court are no stronger than the unpreserved claim the majority endorses.

*First*, the Employer argues that the Board cannot "sit in judgment upon the substantive terms" offered in effects bargaining. Pet'r's Br. 23 (emphasis omitted) (quoting *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 106 (1970)). True, but the Board can decide the lawfulness of an impasse. *See, e.g.*, *NLRB v. Cent. Mach. & Tool Co.*, 429 F.2d 1127, 1129-30 (10th Cir. 1970) ("[T]he *H.K. Porter* case does not appear to withdraw the Board's authority to determine whether a . . .

---

[4] As the Board explained, even if backpay in general were a mandatory subject, a mileage setoff would not be. 364 NLRB No. 108, at 4 (Employer's "insistence to impasse on treating 1 week of *Transmarine* backpay as a credit against an anticipated recovery in a future lawsuit was impermissible" because it sought to transform public right into private one); *see The State Journal*, 238 NLRB at 388 (because backpay "is not a private right but is a public right granted to vindicate" "the public interest in preventing and deterring unfair labor practices," "the Board has refused to permit an employer to reduce the amount of backpay by the amount of its private claims").

violation has occurred by a company's insistence upon including a nonmandatory bargaining subject to a point of impasse.").

*Second*, the Employer argues that its proposed setoffs constituted "an offer of severance," Pet'r's Br. 13, and that it lawfully insisted to impasse on such "severance," Pet'r's Br. 25-26, 30-31. Virtually all the evidence is to the contrary. The Employer's counsel's memorialization of the April 4 meeting described the offer, six times, as involving "backpay." JA 213-14. The memo nowhere mentioned severance pay. The Employer's offer letter to the Union described the offer, five times, as involving "backpay." JA 222-23. The letter nowhere mentioned severance pay. Granted, for a fleeting moment in testimony before the ALJ, the Union president described the offer as involving "severance pay." JA 50. A few moments later, however, he described it as involving "back pay." JA 53. There is no indication that in either instance he gave any thought to the legal distinction between the two. His equivocal testimony, two years after the fact, does not fairly detract from the weight of the Employer's counsel's contemporaneous memo and the offer letter itself.[5]

---

5 For reasons I have discussed, *see supra* pp. 2-3, 13 & note 3, the distinction between severance pay and backpay is substantive, not "semantic," Maj. Op. 14, 17. Contrary to the majority's apparent view—and even accounting for the Union president's equivocal testimony—it is by no means unreasonable to hold the Employer to the precise meaning of the technical terms its counsel used (and pointedly did *not* use) during the negotiations themselves. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202(3) (1981) ("Unless a different intention is manifested, . . . technical terms and words of art are given their technical meaning when used in a transaction within their technical field."). Nor do I see any basis to discount the terms used in the contemporaneous memo and offer

*Third*, the Employer argues in its reply brief—but not sufficiently in its opening brief—that the Union lacked capacity to bargain because of a decertification petition filed by unit employees (but later dismissed by the Regional Director). *Compare* Pet'r's Br. 11-12, 35 (mentioning petition in passing), *with* Pet'r's Reply Br. 16-22 (finally raising argument about it). Even apart from the Employer's forfeiture of the argument, *see Bellagio, LLC v. NLRB*, 863 F.3d 839, 848 (D.C. Cir. 2017) (argument first raised in reply is forfeited), it fails because a pending decertification petition (let alone a dismissed one) does not affect a union's bargaining status, *Levitz Furniture Co.*, 333 NLRB 717, 727 (2001).

*Fourth*, and finally, the Employer argues that "the Union, the General Counsel and the [Employer] all stipulated" that the parties "reached a lawful impasse" on April 11. Pet'r's Br. 17; *see* Oral Arg. Recording 12:06-12:15 (asserting stipulation said "that a lawful impasse had been reached"). This is a gross misstatement that one hopes was unintentional. The stipulation was between the Employer and General Counsel only. JA 251-53. It was a "stipulation of facts" signed during Board proceedings two years after bargaining and more than eighteen months after the Union ceased to exist. JA 251; *see* JA 253. In short, *the Union* never stipulated that the parties reached an impasse, lawful or otherwise.

---

letter merely because the Employer made an unsupported, self-serving, *post hoc* "representation" to the Board that the offer "concerned severance pay." Maj. Op. 13 (apparently referring to Employer's Board brief at JA 284). It should go without saying that the offer letter is the best evidence of the offer, *cf.* FED. R. EVID. 1002, whereas an argument in litigation is no evidence at all, *cf. United States v. Williams*, 212 F.3d 1305, 1312 (D.C. Cir. 2000) (it is "standard" practice to tell jurors as much).

18

As for the General Counsel, he stipulated only that the parties "reached an impasse" in the factual sense: after April 11, neither side contacted the other "to engage in further bargaining." JA 252. The stipulation was careful to state that it did not address "whether or not impasse was reached in April." *Id.* From context, I take the quoted language to mean that the General Counsel did not concede the impasse was lawful. After all, on the same day he entered the stipulation, *see* JA 30, he argued to the ALJ that "although the parties had reached an impasse [on April 11], *such impasse was not lawful*," JA 40-41 (emphasis added).

In my view, neither the Employer nor the majority has offered any good reason to second-guess the Board's findings that the April 11 impasse was not lawful and that, as a result, the backpay period lasted for twenty-six weeks. Accordingly, I respectfully dissent.