# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 2, 2019                    Decided October 6, 2020

No. 19-1025

NAPLETON 1050, INC., D/B/A NAPLETON CADILLAC OF
LIBERTYVILLE,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 19-1064

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Tae Y. Kim* argued the cause for petitioner. With him on the briefs was *Daniel F. Lanciloti*. *James F. Hendricks Jr.* entered an appearance.

*Jared D. Cantor*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Peter B. Robb*, General Counsel, *David Habenstreit*, Acting Deputy Associate General Counsel at the time the brief was filed, and *Julie Brock Broido*, Supervisory Attorney.

Before: MILLETT, WILKINS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* RAO.

MILLETT, *Circuit Judge*:  The service technicians at Napleton Cadillac of Libertyville mounted a successful union drive in 2016 and went on strike in August 2017.  The National Labor Relations Board found that Napleton Cadillac's response to both of those actions constituted discrimination against the employees' rights to collective action under the National Labor Relations Act ("Act"), 29 U.S.C. §§ 151 *et seq.*

Napleton Cadillac petitions for review of the Board's decision.  Its central objection is that, with respect to the adverse actions taken against two employees, its open intent to discriminate against employees for exercising their statutory right to unionize does not matter because Napleton Cadillac was intentionally punishing the entire workforce (including those two employees) for the vote to unionize, rather than retaliating against those employees because of their individual union activity.

We hold that the Board properly focused its analysis on the employer's discriminatory intent to punish its employees as a group for their known decision to unionize, rather than on the employer's knowledge of the targeted employees' individual views about the union.  Intentional discrimination against the statutorily protected collective actions of employees remains discrimination even when it takes the form of scapegoating.

3

**I**

**A**

The National Labor Relations Act makes it "the policy of the United States" to "encourag[e] the practice and procedure of collective bargaining[,]" and to "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151.

To those ends, Section 7 of the Act protects employees' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. § 157.

Section 8(a) of the Act enforces those rights by prohibiting employers from engaging in several types of unfair labor practices. 29 U.S.C. § 158(a). As relevant here, Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7.]" *Id.* § 158(a)(1). And Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" *Id.* § 158(a)(3).

**B**

Napleton Auto Group owns at least fourteen vehicle dealerships in Illinois and neighboring states. In June 2016, the

company bought Weil Cadillac, a dealership in Libertyville, Illinois, and rebranded it as Napleton Cadillac of Libertyville.

At the time that Napleton Auto Group acquired Weil Cadillac, the dealership was not unionized. But six of Napleton Auto Group's other dealerships were. The Napleton Auto Group dealerships that employed those other unionized employees were all members of the New Car Dealer Committee ("Dealer Committee"), a management-side bargaining association comprising more than 100 dealerships in the Chicago area.

Napleton Cadillac retained most of Weil Cadillac's employees, including all twelve car-servicing employees, who were lube technicians, semi-skilled technicians, apprentices, and journeyman mechanics.

One of the journeyman mechanics was David Geisler, who had worked at the dealership for twenty-two years and was "a GM world-class technician[.]" *Napleton 1050, Inc.*, 367 N.L.R.B. No. 6, slip op. at 2 & n.5 (Sept. 28, 2018).

Another was Bill Russell, who had worked at the dealership for nearly thirty years but was on medical leave and receiving workers' compensation at the time the dealership was acquired. Every month after the ownership change, Russell visited the dealership to provide a work status report from his doctor. He usually provided the reports to a human resources employee who reported to the office manager, Pam Griffin. On each visit, Russell also would stop to talk with the service manager, Walter "Scott" Inman, and discuss when he expected to be able to return to work. During Russell's June 2016 visit, Inman told him, "We're really busy. We could use you." *Napleton*, 367 N.L.R.B. No. 6, at 8. In July 2016, Inman again asked Russell when he could return to work.

This case arises out of two events at Napleton Cadillac:  a union drive in 2016 and a strike in 2017.

**1**

In early August 2016, Local Lodge 701, International Association of Machinists & Aerospace Workers, AFL–CIO ("Union") began a unionization drive at Napleton Cadillac. During the campaign, the employees neither openly supported nor discussed the Union at work.

Napleton Cadillac's management opposed unionization. As the Board's administrative law judge ("ALJ") recounted, Inman and Tony Renello, Napleton Auto Group's corporate manager, led "three captive-audience luncheon meetings" to "discourage employees from voting for the Union[,]" and Napleton sent employees a "lengthy letter from Inman just before the election urging [them] to vote no[.]" *Napleton*, 367 N.L.R.B. No. 6, at 7, 15.

During Russell's August 2016 visit—the first one after the unionization drive started—Inman said to him, "I don't know why you guys couldn't have waited to see how things played out before you bring the union in." *Napleton*, 367 N.L.R.B. No. 6, at 8.  Inman and Russell then discussed when Russell might be able to come back to work.  That same month, Russell attended a union organizing meeting.  He later told Inman about his attendance there.

Inman brought up the Union again when Russell visited in September, asking, "Why couldn't you just wait and see how things played out?" *Napleton*, 367 N.L.R.B. No. 6, at 8.  As Russell put it, Inman also said "that with the union coming in, people were going to get written up who were coming in late[;] if you punched in late, you would be written up[.]" *Id.*

Despite management's efforts, the Union won the representation election on October 18, 2016.

When Russell stopped by the dealership shortly after the election with an update from his doctor, Inman said to him, "Well, it looks like you guys had your way.  You got the vote in.  You got the union in." *Napleton*, 367 N.L.R.B. No. 6, at 8.  Russell recalled:  "And then [Inman] said to me * * * it was kind of shitty and sneaky for me to come in there and vote and not even say hi to him.  I said I didn't want to make a big deal of it.  I was just coming in to vote and leave.  Then we discussed when I'd be coming back." *Id.*

Two days later, Napleton Cadillac sent Russell a letter terminating his employment.

Russell returned the next week with a truck and trailer to pick up his tools.  While at the dealership, he spoke with Inman, who said "I'm sorry this happened." *Napleton*, 367 N.L.R.B. No. 6, at 9.  During their conversation, Bill Oberg, another mechanic, walked by, and Inman said, "That's the guy who started all this." *Id.*  Russell told Inman that "there were other people who got the union in here[,]" and that if Napleton Cadillac was "going after [Oberg], you're going after the wrong person." *Id.*  Inman did not deny that "all this" meant the union drive.  Instead, he asked, "Really?" to which Russell replied, "yes." *Id.*

About that same time, Napleton Cadillac began the process of laying off David Geisler, the twenty-two-year-veteran journeyman mechanic.  On October 21, 2016—three days after the Union won the election—Michael Jopes, Napleton Auto Group's chief financial officer, called Napleton Cadillac's attorney James Hendricks and told him that "they had to lay off at least one technician" given the dealership's insufficient "productivity." *Napleton*, 367 N.L.R.B. No. 6, at 10.

On October 27, 2016—the same day that Russell was fired—Hendricks informed the Union that Napleton Cadillac was "laying off David Geisler, [the] lowest booking tech for the last 10 weeks." *Napleton*, 367 N.L.R.B. No. 6, at 10. Inman then called Geisler into his office and "told him he was being 'laid off for lack of hours.'" *Id.* Geisler testified that, at the end of that meeting, Inman said "he asked us not to vote that way." *Id.*

A few months later, Inman contacted Geisler to ask whether he "would entertain the idea of being rehired because business had increased." *Napleton*, 367 N.L.R.B. No. 6, at 10. Geisler declined.

Napleton Cadillac provided a competing version of the events that led to Russell's termination and Geisler's layoff. According to the dealership, Russell was never an employee of Napleton Cadillac, and Geisler's layoff was in the works before the union vote. The ALJ found those claims to be wholly lacking in credibility and made up. *Napleton*, 367 N.L.R.B. No. 6, at 15–18.

More specifically, with respect to Russell, the ALJ found that Napleton Cadillac's claim that it had never employed Russell "simply reek[ed] of fabrication." *Napleton*, 367 N.L.R.B. No. 6, at 15. If Napleton Cadillac really had not hired Russell, the ALJ reasoned, "[s]urely someone [would have] wondered why he was voting in the representation election, or why Inman hand-wrote 'Disabled' across from his name on the employee list[.]" *Id*. at 16.

As for Geisler's layoff, the ALJ rejected Napleton Cadillac's assertion that it had long planned a productivity-based layoff because of "the complete lack of nonsuspicious explanation for the timing[,]" especially after Jopes testified to a "version of events" that was "flatly contradicted by the record

evidence and the testimony of Attorney Hendricks." *Napleton*, 367 N.L.R.B. No. 6, at 16–17.

**2**

Just over a month after the unionization election, Napleton Cadillac and the Union began bargaining for a labor agreement. By August 2017, the Union concluded that negotiations had stalled.

Meanwhile, on August 1, 2017, the Union began a strike against the Dealer Committee's 129 member dealerships. While Napleton Cadillac was not part of the Dealer Committee targeted by the strike, Napleton Auto Group's six other unionized dealerships were.

On July 31st, the day before the Dealer Committee strike, Napleton Cadillac convened a meeting of its employees. Napleton Auto Group's corporate manager, Tony Renello, told the employees that they had an opportunity to take advantage of the strike. He explained that Napleton Auto Group would "funnel the work" from its nearby dealerships, the employees could work as many hours as they wanted, Napleton Cadillac would "feed [them] steaks," and they could "make as [much] money as [they] want[ed]." *Napleton*, 367 N.L.R.B. No. 6, at 12. Renello testified that the employees' response—"smiles and head shakes, yeah, yeah, yeah, yeah"—indicated to him that they were on board with his plan. *Id.*

But on the morning of August 1st, Napleton Cadillac's employees joined the strike. According to Renello, the employees' decision to strike "caught us totally off guard." *Napleton*, 367 N.L.R.B. No. 6, at 12.

That day, Renello and Jopes hand-delivered a letter to the employees while they were picketing in front of the Napleton

Cadillac dealership. The letter was meant "to let [the employees] know the consequences of [their] strike[,]" one of which was that Napleton Cadillac would "[m]ake arrangements to have your tool boxes removed from the shop, as we do not want to be responsible for your tools when you are not working." J.A. 328. The letter concluded: "It is unfortunate that you have chosen to strike, but that is the choice you have made." J.A. 328.

Renello testified that, while he and Jopes were distributing the letters, he told the striking employees that they had to remove their toolboxes in two days. Renello also told the employees that they were welcome to return to work, in which case Napleton Cadillac would treat them as if the strike had never happened.

Consistent with industry practice, Napleton Cadillac's mechanics owned their own tools and toolboxes and kept them at the dealership even when they were not working. Just to be clear: These are not ordinary, hand-carried toolboxes. Rather, they are "large metal tool cabinets, some up to 15 feet long, some up to 6–7 feet high, mounted on retractable wheels, [and] that can weigh thousands of pounds. They are normally moved with tow trucks or other such loading vehicles." *Napleton*, 367 N.L.R.B. No. 6, at 7.

One of the employees' toolboxes looked like this:



J.A. 330.

On the second day of the strike, Renello again told the striking mechanics that they could "just go back to work," and that Napleton Cadillac would "act like this never even happened[.]" *Napleton*, 367 N.L.R.B. No. 6, at 13. But if they continued to strike, "tomorrow we are going to start pushing [the toolboxes] out." *Id.*

At the same time, Renello, Hendricks, and the Union were in talks about the deadline for removing the toolboxes, given how difficult it was for employees to arrange tow trucks or similar equipment to move the massive toolboxes on such short notice. Hendricks originally gave the employees until August 4th to move their toolboxes. But on the morning of August 3rd, Hendricks told the Union that his client was angry about the August 4th deadline, and that the toolboxes would have to be removed that day.

So it was that, on the third day of the strike, Renello, Jopes, Inman, and two employees from another Napleton Auto Group dealership rolled the employees' toolboxes "outside the fenced gates of the dealership onto the service access driveway[,]" where they left the toolboxes and their "expensive" contents "uncovered and unattended[.]" *Napleton*, 367 N.L.R.B. No. 6, at 6, 13. That afternoon, there was a "torrential downpour." *Id.* at 13. In response, Napleton Cadillac pushed the toolboxes back inside, but not before two employees' toolboxes were damaged. The Union and the employees hired a towing service to pick up the toolboxes the next day.

Napleton Auto Group did not demand that the striking employees at its other dealerships remove their toolboxes. Renello said that was because, unlike the voluntary choice to strike made by Napleton Cadillac employees, "most of" the "technicians and the other stores wanted to work through the strike. They just weren't allowed to." *Napleton*, 367 N.L.R.B. No. 6, at 19.

Jopes offered a different explanation at trial, claiming that Napleton Cadillac ordered the toolboxes removed because its "insurance company informed [it] that there would be a lack of coverage should there be damage" because the employees "were not working employees at that point." *Napleton*, 367 N.L.R.B. No. 6, at 19. The ALJ did not believe Jopes, pointing out that the insurance policy expressly applied to "loss of or damage to tools and equipment owned by your employees and used by them in your business." *Id.* When Jopes asserted that the strikers "were not using the tools in [Napleton Cadillac's] business," the ALJ found that to be as nonsensical as saying that the tools are not covered when employees go home at night or take a vacation. *Id.*

## C

The Union and Russell timely filed unfair labor practice charges against Napleton Cadillac. 29 U.S.C. § 160(b). The Board's General Counsel consolidated the cases and issued a complaint.

After a three-day hearing, the ALJ found that Napleton Cadillac committed several unfair labor practices. He found that Napleton Cadillac terminated Russell and laid off Geisler in "retaliation" for its employees' voting to unionize, which violated Sections 8(a)(3) and 8(a)(1) of the National Labor Relations Act. J.A. 75. The ALJ also found four more violations of Section 8(a)(1): (i) Inman telling Geisler that he was being laid off because the employees voted to unionize; (ii) Inman creating the impression in his conversation with Russell about Oberg that Napleton Cadillac was surveilling its employees' union activity; (iii) Napleton Cadillac ordering—and carrying out—the removal of the toolboxes in retaliation for the strike; and (iv) Napleton Cadillac implicitly threatening in the August 1, 2017 letter that employees would lose their jobs for striking.

Napleton Cadillac and the General Counsel both timely filed exceptions to the ALJ's findings. Neither party disputed that Napleton Cadillac violated Section 8(a)(1) by telling Geisler that he was being laid off because the employees voted to unionize.

The Board reversed as to the implied threat of job loss, concluding that Napleton Cadillac's August 1, 2017 letter did not amount to such a threat. The Board affirmed all of the other violations, and then amended the ALJ's recommended order by requiring Napleton Cadillac to reimburse the employees for the cost of towing their toolboxes and for the rain damage to two

of the toolboxes. Finally, the Board rejected Napleton Cadillac's evidentiary and procedural challenges.

Napleton Cadillac petitioned for review, and the Board cross-applied for enforcement.

**II**

We have jurisdiction to review the Board's decision under 29 U.S.C. § 160(e) and (f). "[W]e will uphold the Board's decision if its ruling is not arbitrary, capricious, or founded on an erroneous application of the law, and if its factual findings are supported by substantial evidence." *Advanced Life Sys. Inc. v. NLRB*, 898 F.3d 38, 43 (D.C. Cir. 2018); *see also* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *NLRB v. Ingredion Inc.*, 930 F.3d 509, 514 (D.C. Cir. 2019) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). Our review "is generally deferential in light of the Board's claim to expertise in the area of labor relations." *Constellium Rolled Products Ravenswood, LLC v. NLRB*, 945 F.3d 546, 550 (D.C. Cir. 2019). That said, "[a]n unexplained divergence from [Board] precedent would * * * render a Board decision arbitrary and capricious." *Id.* (internal quotation marks omitted).

We review the Board's procedural rulings for abuse of discretion. *See Salem Hosp. Corp. v. NLRB*, 808 F.3d 59, 67 (D.C. Cir. 2015); *see also Veritas Health Servs., Inc. v. NLRB*, 895 F.3d 69, 87 (D.C. Cir. 2018) ("We review the Board's affirmance of an ALJ's discretionary judgments * * * for abuse of discretion."). We reverse only if the petitioner establishes that "'prejudice resulted from' the Board's [procedural]

lapses." *Salem Hosp.*, 808 F.3d at 67 (quoting *Desert Hosp. v. NLRB*, 91 F.3d 187, 190 (D.C. Cir. 1996)).

## III

### A

The Board's ruling that Napleton Cadillac violated Sections 8(a)(3) and 8(a)(1) by terminating Russell and laying off Geisler to punish its employees for their pro-union vote is reasoned, consistent with the statutory text and precedent, and supported by substantial evidence.

### 1

To establish a violation of Section 8(a)(3), the Board had to find that Napleton Cadillac "encourage[d] or discourage[d] membership in" the Union in a particular way:  "by discrimination in regard to hire or tenure of employment or any term or condition of employment[.]"  29 U.S.C. § 158(a)(3).

The finding of a violation of Section 8(a)(3) would also trigger a violation of Section 8(a)(1), which prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of [their Section 7] rights[,]" 29 U.S.C. § 158(a)(1). *See Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983); *Ozburn–Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 217–218 (D.C. Cir. 2016); *see also Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 480 n.5 (D.C. Cir. 2020) ("Employer discipline violates Section 8(a)(1) and (3) when the protected activity at issue is union participation.").

Because the central question in the case was Napleton Cadillac's motive for firing Russell and laying off Geisler— whether those decisions were intended to punish or

discriminate against union activity—the Board adjudicated the retaliation claims by applying its well-established *Wright Line* burden-shifting framework. *See Wright Line*, 251 N.L.R.B. 1083 (1980); *see also NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 400–404 (1983) (upholding the *Wright Line* framework), *abrogated in other part by Director, Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267 (1994); *Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1100–1101 (D.C. Cir. 2019).

The Board designed the *Wright Line* test to determine whether an unlawful motive underlay an adverse action taken by an employer. *See Wright Line*, 251 N.L.R.B. at 1083 (describing the decision as "set[ting] forth formally a test of causation for cases alleging violations of Section 8(a)(3)"); *see also Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125 (D.C. Cir. 2001) (Under Sections 8(a)(3) and 8(a)(1), "[t]he central question is the employer's motivation for taking the adverse action, and to make that determination the [Board] employs the so-called *Wright Line* test.").

The *Wright Line* inquiry requires, first, that the General Counsel "make a *prima facie* showing sufficient to support the inference that protected conduct was a motivating factor in the" adverse employment action. *Novato Healthcare*, 916 F.3d at 1100–1101 (formatting modified); *accord Wright Line*, 251 N.L.R.B. at 1089. If the General Counsel meets that initial burden, then "the burden of persuasion shifts to the [employer] to show that it would have taken the same action in the absence of the unlawful motive." *Novato Healthcare*, 916 F.3d at 1101 (formatting modified).

**2**

This case turns on the first prong of the *Wright Line* test— whether the General Counsel made a *prima facie* showing that

Napleton Cadillac's overt anti-union animus motivated Russell's termination and Geisler's layoff. The record amply supports the Board's conclusion that such a showing was made.

To make out a *prima facie* case, the Board held that the General Counsel "need not prove" the employer's knowledge of each affected employee's individual union activity if the employer "takes adverse action against employees, regardless of their individual sentiments toward union representation, 'in order to punish the employees as a group to discourage union activity or in retaliation for the protected activity of some.'" *Napleton*, 367 N.L.R.B. No. 6, at 14 (quoting *Electro-Voice, Inc.*, 320 N.L.R.B. 1094, 1095 n.4 (1996)); *see id.* at 14 n.20 (collecting cases). *See also Novato Healthcare*, 916 F.3d at 1105; *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1180 (6th Cir. 1985).

That is so, the Board has long held, because "general retaliation by an employer against the workforce can discourage the exercise of [S]ection 7 self-organization and collective bargaining rights just as effectively as adverse action taken against only known union supporters." *Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162, 1169 (D.C. Cir. 1993) (alteration in original) (quoting *Birch Run*, 761 F.2d at 1180); *cf. Thompson v. North American Stainless, LP*, 562 U.S. 170, 172–175 (2011) (holding that "third-party reprisals" can amount in some circumstances to retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*); *id.* at 178 ("Hurting him was the unlawful act by which the employer punished her.").

Here, the Board properly found a *prima facie* case that Napleton Cadillac violated the Act by discharging Russell and laying off Geisler "in retaliation for the unit employees' decision to unionize." *Napleton*, 367 N.L.R.B. No. 6, at 1 n.2,

14–16.  That decision faithfully followed a long line of Board and judicial precedent, and fully comports with both the relevant statutory text and *Wright Line* itself.

*First*, courts and the Board have long recognized that Section 8(a)(3) outlaws punishing the workforce as a whole for its union activity just as strongly as it outlaws punishing particular union supporters.  The central focus of the *Wright Line* analysis is on "the employer's motivation," not on the affected employee's union sentiments.  *NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 510 (4th Cir. 1991).

Of course, the employer's awareness of a targeted employee's union activity is the most common way of proving an employer's "actual discriminatory intent."  *Advanced Life Sys. Inc. v. NLRB*, 898 F.3d 38, 49 (D.C. Cir. 2018).  But such individualized knowledge is not always necessary for a violation to be found.  *See Frigid Storage*, 934 F.2d at 510.  As long as the employer is taking adverse action against an employee or employees for the specific purpose of punishing or discouraging known union activity in the workplace, the employer "cannot cleanse an impure heart with ignorance of individual employee sentiments."  *Id.*

At least as reflected in Board decisional law, the most common way employers have taken their anti-union animus out on a workforce rather than a specific union-supporting employee has been through "extensive" or "mass" layoffs, *e.g.*, *Davis Supermarkets*, 2 F.3d at 1168–1169; *Birch Run*, 761 F.2d at 1180, or attempts to cover up targeted retaliation against union supporters by sweeping in employees whose union views were unknown, *e.g.*, *Novato Healthcare*, 916 F.3d at 1105.

But those are not the only ways.  Employers have also vented their discriminatory animus by scapegoating a few employees to send a message of anti-union hostility and anger

over collective action to the larger workforce. For example, in *Frigid Storage*, the day after the union petitioned for a representation election, the company's manager gathered his fifteen employees, went on an "anti-union tirade," and threatened to fire two employees that day and possibly one more the coming Monday. 934 F.2d at 507–508, 510. He followed through by firing two known union supporters the same day. Then, on Monday, the employer fired a third employee whose union views were unknown. *Id.* at 508–510.

The Board found that each of the three firings independently violated Section 8(a)(3). *Frigid Storage, Inc.*, 294 N.L.R.B. 660, 661 (1989). When the employer petitioned for review, the Fourth Circuit rejected its claim that firing the third employee could not be unlawful discrimination because the employer did not know whether the third employee was a union supporter. *Frigid Storage*, 934 F.2d at 509–510. The court of appeals held that, "[t]hough employer knowledge" of an employee's union views "is obviously relevant, it is not dispositive, especially in a multiple-employee discharge." *Id.* at 510. What mattered was "that [the] discharge was motivated by anti-union animus," as evidenced by the connection between the firing and the employer's threat, and by the "pretextual" excuse for termination that the employer cooked up. *See id.*

The Board has likewise held that an employer violated Section 8(a)(3) by implementing a retaliatory wage freeze that affected only one employee, even though it did not know whether that particular employee was a union supporter. *See W.E. Carlson Corp.*, 346 N.L.R.B. 431, 432–433 (2006). In the face of a dissent that would have required knowledge of the affected employee's union views, *id.* at 437 (Battista, Chairman, dissenting in part), the Board unequivocally held that it was "immaterial that the [employer] lacked knowledge

of union activity specifically by" that particular employee because it was retaliating against "the organizing effort" by employees generally, *id.* at 433 (majority opinion) (citing *Birch Run*, 761 F.2d at 1180).

Similarly, we said just last year that "the Board has long held" that "an employer's discharge of uncommitted, neutral, or inactive employees" either to cover up for discrimination against a targeted union-supporting employee *"or to discourage employee support for the union"* violates Section 8(a)(3). *Novato Healthcare*, 916 F.3d at 1105 (emphasis added) (quoting *Dawson Carbide Indus., Inc.*, 273 N.L.R.B. 382, 389 (1984)); *see generally Circus Circus Casinos*, 961 F.3d at 480 ("[T]he line between employer prerogative and unlawful infringement of employees' rights is a question of motive.").

To that same point, every case on which the Board relied here focused its analysis on the employer's unlawful motive, not on the particular union views of the employees affected by its actions and not on whether the action targeted many rather than a few employees. *See, e.g.*, *Birch Run Welding & Fabricating, Inc.*, 269 N.L.R.B. 756, 764–765 (1984) (holding that an employer violated Section 8(a)(3) by "engag[ing] in a general retaliation against its employees because of the union activities of some of its employees in order to frustrate all union activities"), *enforced*, 761 F.2d 1175 (6th Cir. 1985); *J.T. Slocomb Co.*, 314 N.L.R.B. 231, 241 (1994) (noting that "the focus of" the discrimination theory approved in *Birch Run* "is upon an employer's motive in discharging its employees rather than upon the antiunion or prounion status of particular

employees") (internal quotation marks omitted).[1] Napleton Cadillac's effort to distinguish these cases as "all requir[ing] a mass layoff" (Br. 35) mistakes their facts for the Board's reasoning.

Tellingly, Napleton Cadillac has not identified—and we have not found—a single case to support its view that discrimination in this form only counts when the employer's action hits some numerosity or workplace-wide threshold. There is no two-free-bites rule under Section 8(a)(3). Nor have any of the cases that Napleton Cadillac cites (or that we have found) treated the number of employees affected as dispositive, or even analyzed it as doctrinally relevant. To the contrary, the Board's and courts' analysis in workplace-wide discrimination cases focuses time and again on whether the employer acted with the unlawful intent of discouraging or punishing union activity. Creatively or erratically packaging that discrimination gets no free pass.

So too here: The Board found that Napleton Cadillac discharged Russell and Geisler for the express, announced, and prohibited purpose of retaliating against and punishing its employees' collective vote for the Union. That is what Section 8(a)(3) and Board and circuit precedent require to make out a *prima facie* case under *Wright Line*. *See Frigid Storage*, 934 F.2d at 510; *Birch Run*, 761 F.2d at 1180 ("The courts have held that although the General Counsel must usually show that the employer knew about individual employees' union activities before the Board may conclude that the employer violated Section 8(a)(3), the General Counsel *may also prevail by showing that the employer [acted] * * * in*

---

[1] *See also Electro-Voice*, 320 N.L.R.B. at 1095 n.4; *ACTIV Indus., Inc.*, 277 N.L.R.B. 356, 356 n.3 (1985) (citing *Birch Run*, 761 F.2d at 1180); *Pyro Mining Co.*, 230 N.L.R.B. 782, 782 n.2 (1977).

*retaliation against its employees because of the union activities of some.*") (emphasis added). In other words, when the intent is to punish or discourage union activity, it is no defense to a Section 8(a)(3) violation that "the employer wield[ed] an undiscerning axe" in choosing the targets to implement its illegal objective. *Frigid Storage*, 934 F.2d at 510 (collecting cases).

*Second*, the consistency of precedent is explained by the plain statutory text, which focuses on the employer's anti-union motive, not the views of the affected employees. After all, Section 8(a)(3) does not prohibit an employer from taking an adverse action against an individual *because of* that individual's protected activity. Instead, the statute hinges the employer's liability on its intent to "discourage" employees' interest in unionization "*by* discrimination in regard to * * * any term or condition of employment[.]" 29 U.S.C. § 158(a)(3) (emphasis added).

Likewise, Section 8(a)(1) focuses not on which employees (pro- or anti-union) or how many employees are affected by adverse employer action, but rather on whether the employer's conduct "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of [their Section 7] rights[.]" 29 U.S.C. § 158(a)(1) (emphasis added); *see also Advanced Life Sys.*, 898 F.3d at 44 ("A Section 8(a)(1) violation occurs when, considering all of the surrounding circumstances, the employer's conduct reasonably tended to interfere with an employee's exercise of her Section 7 collective action rights.").

Said another way, "motive is the lynchpin" under the statute. Dissent Op. 10. Firing employees—union supporters or not—to intentionally send a message to employees that union activity will have hurtful consequences falls squarely within the statute's prohibitions. And Napleton Cadillac, for

its part, makes no argument that the statutory text permits such intentional discriminatory retribution as long as it comes just a couple of employees at a time. Discrimination is a "toxin[] [that] can be deadly in small doses." *Buck v. Davis*, 137 S. Ct. 759, 777 (2017).

*Third*, the Board's focus on an employer's intent to discriminate against known union activity hews to *Wright Line* itself. The problem the Board set out to solve in *Wright Line* was uncertainty surrounding the correct "test of causation for cases alleging violations of Section 8(a)(3)[.]" 251 N.L.R.B. at 1083. Having a "formal[]" test was important, the Board explained, because "[i]n modern day labor relations, an employer will rarely" admit "that it has disciplined an employee because it detests unions or will not tolerate employees engaging in union or other protected activities." *Id.* So the Board needed a way to sort out when an employer acts for "a legitimate business reason" and when its action is instead—or additionally—an unlawful "reaction to its employees' engaging in union or other protected activities." *Id.* at 1083–1084.

To that end, the Board devised in *Wright Line* a burden-shifting framework designed to "determine the relationship, if any, between employer action and protected employee conduct." 251 N.L.R.B. at 1089. Which is precisely how the Board employed *Wright Line* here. J.A. 71.

Applying the *Wright Line* framework, the Board reasonably concluded that Napleton Cadillac violated Sections 8(a)(3) and 8(a)(1) by terminating Russell and Geisler to punish its employees' decision to vote for union representation. Substantial evidence supports the Board's factual finding that anti-union animus and a desire to strike back at employees motivated Napleton Cadillac's actions.

Service Manager Scott Inman openly said as much when he ended the meeting in which he laid off Geisler by stating that "he asked the employees 'not to vote that way.'" *Napleton*, 367 N.L.R.B. No. 6, at 10, 16. And when Russell came to pick up his belongings, Inman said he was "sorry this happened"— and then referred to a suspected unionization leader as "the guy who started all this." *Id.* at 9, 15; *see also id.* at 15 (ALJ finding, based on the factual context, "that when Inman attributed the action against Russell to 'everything that happened,' he was referencing the union drive").

Through Inman's comments, Napleton Cadillac all but admitted that it discharged Russell and laid off Geisler as retribution for the employees' collective decision to unionize. And Napleton Cadillac's later pretextual explanations for its actions brought the point home. *See Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1075 (D.C. Cir. 2016) ("A finding of pretext may support an inference of unlawful motive[.]"); *Napleton*, 367 N.L.R.B. No. 6, at 15–16 (finding that Napleton Cadillac's assertion that it never hired Russell was "a pretext" for retaliation, and summarizing evidence debunking Napleton Cadillac's "fantastic claim that it did not notice * * * until immediately after the election" that it had treated Russell as an employee who was on disability leave); *id.* at 16–17 ("There is no documentation—no notes, no email, no message slips, no report, nothing—that" supports Napleton Cadillac's claim that a layoff was in the works before the union election.).

For those reasons, the Board reasonably concluded that Napleton Cadillac "wield[ed] an undiscerning axe" against Russell and Geisler to punish its employees' collective decision to unionize. *Frigid Storage*, 934 F.2d at 510.

**3**

The partial dissenting opinion presses two main objections to the Board's decision.  But those concerns misunderstand the Board's precedent and its application to this case.

*First*, the dissenting opinion objects that the Board has departed from prior precedent requiring that the employer have knowledge specifically of the affected employee's union activities.  Dissent Op. 2–3.

But prior Board decisions and court precedent had already held that *Wright Line* does not strictly require that an employer always have knowledge of an affected employee's individual union activities.  The holding that Napleton Cadillac violated Section 8(a)(3) by firing and laying off two employees as a means of deliberate retribution against the workforce's decision to unionize is all of a piece with Board and circuit court precedent in *Frigid Storage* and *W.E. Carlson Corp.*, and the legal rules applied there.

In *Frigid Storage*, as here, employer knowledge of the affected employee's union views or activities "[wa]s not dispositive" or even required.  934 F.2d at 510.  Even though the ALJ found that "[t]here is no evidence that anyone on behalf of the Respondent was aware of" union activity by employee Franklin or "of any antiunion animus pinpointed against him," the Board ruled that the employer violated Section 8(a)(3) by firing Franklin to strike back at its employees' organizing efforts.  *Frigid Storage, Inc.*, 294 N.L.R.B. at 661, 668.

Likewise, in *W.E. Carlson*, the Board held that the denial of a pay increase for employee Lightfoot violated Section 8(a)(3) even though the employer was "unaware of Lightfoot's union sympathies."  346 N.L.R.B. at 433.  What mattered was

that the employer "was aware \* \* \* that its service technicians had engaged in union activity," and "because of its animus against that activity, decided to freeze wages," and the "effect of that retaliation fell on Lightfoot" alone. *Id*.[2]

The dissenting opinion would chalk those two decisions up to the "essential" fact that other employees whose union views were known to the employer were also the object of retaliation. Dissent Op. 10.

But if that factor were so essential, one would expect it to play some role in those decisions. Yet it was never mentioned in the Board's analysis. In *Frigid Storage*, the court of appeals explained that "the Board had substantial evidence to support its finding that Franklin's discharge violated § 8(a)(3)" based only on "the bare timing of Franklin's discharge on the Monday following [the employer's] Friday anti-union tirade, at which [he] had threatened to discharge an employee on Monday." 934 F.2d at 510. That is so, the Fourth Circuit explained, because "[t]he issue is the employer's motivation, and he cannot cleanse an impure heart with ignorance of individual employee sentiments." *Id*. Nothing in that holding makes the

---

[2] The dissenting opinion's reliance (at 11) on *Gruma Corporation* is misplaced. There, the Board ruled for the employer because "the record as a whole does not provide a basis for inferring knowledge" of union activity by the employee. 350 N.L.R.B. 336, 338 (2007). There was no argument in the case or any facts suggesting that the employee was discharged as retribution for union activity by the workforce as a whole, so the Board did not address or decide the question presented in this case.

discharge of known union supporters an essential, or even a relevant, element.

The Board in *Frigid Storage*, for its part, overturned an ALJ decision that (like the dissenting opinion here) focused on the employer's knowledge of the affected employee's union views. *See* 294 N.L.R.B. at 661 (disagreeing with ALJ's finding that Franklin's discharge did not violate the act); *id.* at 668 (ALJ dismissing complaint as to Franklin because there was "no evidence that anyone on behalf of the [employer] was aware" of Franklin's union activity). The Board ruled that Franklin's termination by itself violated Section 8(a)(3) because "[t]he evidence clearly shows" that his firing was "precipitated by the Respondent's awareness of union activity, its contempt for unions, and a determination to retaliate against employees for mounting an organizational campaign." *Id.* at 661. The separate termination of union supporters days earlier is not mentioned anywhere in that list of factors.

The Board's decision in *W.E. Carlson* was similarly devoid of any tie between the adverse employment action and known union supporters. In response to a dissent that (again, like the dissenting opinion here) would have required employer knowledge of Lightfoot's union views for liability to attach, the Board said that knowledge of Lightfoot's union activity was "immaterial." 346 N.L.R.B. at 433. All that mattered to the Board was that the employer "knew that its service technicians were seeking to organize," and it was "because of its animus against that activity" that it "decided to freeze wages pending the union election, resulting in the denial of Lightfoot's wage increase." *Id.* Contrary to the dissenting opinion's view (at 10), the Board's analysis had nothing to do with other employees whose union views were known, and whether they might or might not eventually have fallen victim to that temporary wage freeze. The Board did not even discuss that

prospect. Presumably because the established timeframe for the wage freeze affected *only* Lightfoot and no one else. *W.E. Carlson*, 346 N.L.R.B. at 432 ("Lightfoot was the only employee whose anniversary date fell during the period between the filing of the representation petition and the holding of the election.").[3]

In short, the Board's holding here was on all fours with Board and circuit precedent. The Board relied on compelling record evidence to show what its decisions have *always* required: evidence that the adverse action at issue was substantially motivated by the employer's intent to punish and discourage known union activity. *Wright Line*, 251 N.L.R.B. at 1089 ("[W]e shall require that the General Counsel make a *prima facie* showing sufficient to support the inference that protected conduct was a '*motivating factor*' in the employer's decision.") (emphasis added).

*Second*, the dissenting opinion reasons that the Board here abandoned the *Wright Line* requirement of employer knowledge of union activity, and now "requires showing only animus by the employer[.]" Dissent Op. 6.

---

[3] The dissenting opinion's effort to shoehorn that precedent into the cover-up exception is simply wishful thinking. *Compare* Dissent Op. at 10 n.4, *with W.E. Carlson*, 346 N.L.R.B. at 433 (holding that the General Counsel showed "a compelling case that animus against its employees' union activities was a motivating factor in the denial of Lightfoot's wage increase"), *and Frigid Storage*, 294 N.L.R.B. at 661 (holding that each individual discharge was "precipitated by the Respondent's awareness of union activity, its contempt for unions, and a determination to retaliate against employees for mounting an organizational campaign"). Scapegoating is its own exception to the general reliance on an employer's knowledge of the targeted employee's union activities to establish motive.

Not so.  The Board has always required evidence both that the employer knew of its employees' union activity, and that its adverse action at issue was substantially motivated by its intent to punish and discourage that activity.  *W.E. Carlson*, 346 N.L.R.B. at 433 ("The Respondent contends it was unaware of Lightfoot's union sympathies when it decided against giving Lightfoot a wage increase in his January 31 paycheck.  The Respondent was aware, however, that its service technicians had engaged in union activity."); *Frigid Storage*, 294 N.L.R.B. at 661 ("All three discharges were precipitated by the Respondent's awareness of union activity[.]").

So too here.  The Board expressly found that Napleton Cadillac knew of its employees' union activity—including their decision to unionize—and that management's anger over that activity was precisely what motivated the discharge and layoff.  *Napleton*, 367 N.L.R.B. No. 6 at 1 n.2 (affirming ALJ's finding of a violation of Section 8(a)(3) "because of their and their coworkers' union activity"); *id.* (Russell's discharge was in "retaliation for the employees' selection of union representation."); *id*. (Napleton Cadillac "specifically linked Geisler's layoff to the union vote.").  Napleton Cadillac, for its part, has never denied that it had full knowledge of protected union activity and, in particular, the employees' decision to unionize at the time of the discharge and layoff.  So the Board found what the dissenting opinion describes as the required elements of a Section 8(a)(3) violation:  "'discrimination' on the part of an employer and a motive of encouraging or discouraging union membership."  Dissent Op. 13 (quoting 29 U.S.C. § 158(a)(3)).

In other words, the Board nowhere adopted the knowledge-less general retaliation standard that the dissenting opinion fears.  And the dissenting opinion's agreement with the

application of *Wright Line* to the mass-layoff and cover-up scenarios, *see* Dissent Op. 3–4, 7, shows that knowledge of the targeted employee's individual views is not necessary to establish a violation of Section 8(a)(3). While the dissenting opinion would forgo the requirement of individualized knowledge only when the employer's discriminatory actions against known union members also happen to "sweep[] in neutral employees," no case has ever adopted that limitation. And the independent imposition of employer liability for the retaliatory actions aimed at Franklin and Lightfoot in *Frigid Storage* and *W.E. Carlson*, respectively, establishes that intentional scapegoating itself violates Section 8(a)(3). *Compare Frigid Storage*, 294 N.L.R.B. at 661, *with id.* at 668 (Board reverses ALJ decision that discharge of Franklin did not violate Section 8(a)(3) because the ALJ improperly relied on the employer's absence of knowledge about Franklin's individual union activities); *compare W.E. Carlson*, 346 N.L.R.B. at 433 (rejecting dissenting Member's view that knowledge of individual employee's union views was necessary under *Wright Line*), *with id.* at 437 (Battista, Chairman, dissenting in part) (stating that dismissal of the complaint was appropriate because General Counsel did not prove "that the Respondent knew of Lightfoot's union activity at the time it decided not to grant him an annual wage increase").

The dissenting opinion worries that, by prohibiting employers from deliberately making an individual employee the fall guy for the workforce's union activity, knowledge of union activities or anti-union animus alone will trigger liability for adverse employment actions. *See* Dissent Op. 9–12. But that concern forgets that, under *Wright Line*, the Board always bears the burden "to 'make a *prima facie* showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision to take adverse action.'"

*Chevron Mining, Inc. v NLRB*, 684 F.3d 1318, 1327 (D.C. Cir. 2012) (quoting *Wright Line*, 251 N.L.R.B. at 1089).

So the "ultimate inquiry is whether there is a 'link, or nexus, between the employees' protected activity and the adverse employment action.'" *Chevron Mining*, 684 F.3d at 1328 (quoting *Tracker Marine, LLC*, 337 N.L.R.B. 644, 646 (2002)). A showing of general animus (let alone mere knowledge) unconnected to the challenged employment action will not suffice. *See id.*; *see also Amber Foods, Inc.*, 338 N.L.R.B. 712, 714 (2002) (finding that, in the absence of any nexus between the employer's general knowledge of union activity and the affected employee's discharge, no Section 8(a)(3) violation was shown).

In other words, correlation is not enough. The *prima facie* case must demonstrate a nexus between the employer's anti-union sentiments and the precise adverse action taken. Such evidence of deliberate scapegoating is usually hard to come by. Most employers will not announce or otherwise evidence their intent to sacrifice an employee or two on the altar of their hostility to collective action. But as in *Chevron Mining*, 684 F.3d at 1328, in this case that link was easily established by the employer's virtual admissions that the discharge and layoff were taken in response to the employees' decision to unionize, *Napleton*, 367 N.L.R.B. No. 6, at 9–10, 15–16.

In other words, the only question here is whether evidence of deliberate scapegoating can support a *prima facie* case of a Section 8(a)(3) violation. The employer will still avoid liability if the General Counsel cannot establish a nexus between the employer's union hostility and the challenged action, or if the employer demonstrates that its employment action rested on a legitimate ground. *Wright Line*, 251 N.L.R.B. at 1087. But when (to borrow from the dissenting opinion), "[i]mproper

motivation * * * [is] combined with an act intentionally taken against known protected activity," "discrimination" under Section 8(a)(3) exists, Dissent Op. 14. That is this case.

The Board's application of its "labor law expertise," Dissent Op. 7, in this way fully comports with *Wright Line* and the plain statutory text it implements. To conclude otherwise, as the dissenting opinion proposes, would mean that the law allows an employer to fire a randomly chosen worker for the express and announced purpose of punishing its employees for unionizing—to "teach them a lesson." Yet that form of direct retribution and punishment of employees is the very type of "discrimination" against and "discourage[ment]" of "membership in any labor organization" that Section 8(a)(3) proscribes. In the context of Section 8(a)(3)'s broadly worded prohibition on discrimination, "such retaliation is intentional discrimination[.]" *Jackson v. Birmingham Board of Educ.*, 544 U.S. 167, 173–179 (2005) (interpreting similarly broad ban on discrimination in Title IX of the Civil Rights Act, 20 U.S.C. § 1681 *et seq.*).

**B**

Napleton Cadillac argues that the Board's separate finding that it retaliated against striking employees by removing their toolboxes from the work area "makes no logical or rational sense" because Napleton Auto Group allowed striking employees at its other dealerships to keep their toolboxes at work during the strike. Napleton's Br. 42.

Napleton Cadillac's argument actually proves the Board's point. The key decisionmaker at Napleton Auto Group, Corporate Manager Tony Renello, explained that the company treated the striking employees at Napleton Cadillac adversely precisely because "[m]ost of our—the other technicians and the

other stores wanted to work through the strike. They just weren't allowed to." *Napleton*, 367 N.L.R.B. No. 6, at 19.

That testimony is a straightforward "admission that it was the Napleton [Cadillac] technicians' *choice* to exercise their right to strike—a choice freely made and thus, in Napleton [Cadillac]'s view, deserving of punishment—that prompted the demand to remove the toolboxes[.]" *Napleton*, 367 N.L.R.B. No. 6, at 19 (emphasis added). The fact that Napleton Cadillac leveled its punitive response only against those employees who voluntarily and willingly chose to exercise their statutory right to strike proves its retaliatory, discriminatory motive.

**C**

Napleton Cadillac next challenges the Board's finding that it unlawfully created an impression of surveillance of union activities when Inman told Russell that he thought a certain employee had started the union drive. On this front, Napleton Cadillac's only argument to this court is that, because Russell was no longer an employee at the time of the conversation, Inman's statement could not have "coerce[d] or restrain[ed] Russell from engaging in protected union activity." Napleton's Br. 32. Because Napleton Cadillac did not present that argument to the Board, we lack jurisdiction to consider it.

Absent extraordinary circumstances (which Napleton Cadillac does not argue exist here), our jurisdiction is confined to objections that parties have first presented to the Board. 29 U.S.C. § 160(e); *First Student, Inc. v. NLRB*, 935 F.3d 604, 614 (D.C. Cir. 2019). "[T]he critical question is whether the Board received adequate notice of the basis for the objection." *Pennsylvania State Corr. Officers Ass'n v. NLRB*, 894 F.3d 370, 376 (D.C. Cir. 2018) (quoting *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085, 1090 (D.C. Cir. 2016)). As to the

surveillance finding, Napleton Cadillac did not preserve its argument.

In the list of exceptions that Napleton Cadillac filed with the Board, it identified its general disagreement with the impression-of-surveillance finding. But it never argued that Russell's employment status precluded the finding of an unfair labor practice. Napleton Cadillac's vague and very general exception was not enough to put the Board on notice of every possible argument it might later choose to advance.

That is not to say that each "ground for [an] exception" must "be stated explicitly in the written exceptions filed with the Board[.]" *Camelot Terrace*, 824 F.3d at 1090 (internal quotation marks omitted). Instead, the problem here is that Napleton Cadillac did not even cross the minimum threshold of ensuring that "the ground for the exception [would] be evident by the context in which the exception is raised." *Id.* (formatting modified).

Case in point is Napleton Cadillac's brief in support of its exceptions. *See Pennsylvania State Corr. Officers*, 894 F.3d at 376. That brief put the Board on notice of just one objection to the impression-of-surveillance finding: that Inman's statement was too ambiguous to create an improper impression of surveillance. *See* Respondent's Brief in Support of Exceptions to the Decision and Recommended Order of the Administrative Law Judge at 13, *Napleton*, 367 N.L.R.B. No. 6 (Nos. 13-CA-187272 et al.). Napleton Cadillac does not pursue that argument here. *See* Oral Arg. Tr. 11:13–12:2 (conceding that the argument "is not in" its brief to this court). And the argument it does pursue—that Inman's statement could not have violated the Act because Russell had already been fired—is nowhere to be found in its arguments to the Board, as

Napleton Cadillac conceded at oral argument, *see* Oral Arg. Tr. 12:2–23.

**IV**

Finally, Napleton Cadillac asks this court to overturn the Board's affirmance of three of the ALJ's procedural rulings. First, Napleton Cadillac objects to the ALJ's application of the witness sequestration rule to exclude one of its attorneys, James Hendricks, from the hearing because Napleton Cadillac planned to call him as a witness.

Second, Napleton Cadillac takes exception to the ALJ's order to return witnesses' affidavits after its cross-examination concluded, rather than at the conclusion of the hearing.

Third, Napleton Cadillac complains that the ALJ declined to sanction a witness for failing to comply with its subpoena directing the witness to bring his toolbox to the hearing.

We need not address the merits of those challenges because, even assuming they were valid, Napleton Cadillac cannot prevail unless it can also "show that 'prejudice resulted from' the Board's [procedural] lapses." *Salem Hosp.*, 808 F.3d at 67 (quoting *Desert Hosp.*, 91 F.3d at 190). "Whether an error is prejudicial depends on a number of factors, including the closeness of the case, the centrality of the issue in question, and the effectiveness of any steps taken to mitigate the effects of the error." *800 River Rd. Operating Co. v. NLRB*, 846 F.3d 378, 386 (D.C. Cir. 2017) (internal quotation marks omitted).

Napleton Cadillac has not come close to making the required showing of prejudice for any of its objections. With respect to witness sequestration, Napleton Cadillac's briefs do not say what more it could have done in its defense had Hendricks been at counsel table or how his absence otherwise

impaired its ability to present its case. Napleton Cadillac's attempt to argue prejudice for the first time at oral argument was too little, too late. *See Save Jobs USA v. Department of Homeland Sec.*, 942 F.3d 504, 511 (D.C. Cir. 2019) ("Generally, arguments raised for the first time at oral argument are forfeited.") (internal quotation marks omitted). In any event, Napleton Cadillac acknowledged that Hendricks was not planning to serve as lead counsel at the hearing. And although Napleton Cadillac suggested that it was at some type of disadvantage because it had only one attorney present, it failed to offer anything concrete or to explain what Hendricks would have done that could not have been handled by counsel at the hearing or any other attorney who was not designated to testify as a witness in the case.

Nor does Napleton Cadillac explain how its cross-examination or presentation of its case was impaired by having to return witnesses' affidavits after they left the stand.

Finally, Napleton Cadillac does not say what it would have gained from having a witness haul his more than a thousand-pound toolbox to the eighth-floor hearing room in the federal courthouse. In fact, at oral argument, Napleton Cadillac (wisely) conceded that there was "no way [the witness] could have brought the toolbox" into the hearing room. Oral Arg. Tr. 8:19–20. Notably, the ALJ repeatedly offered Napleton Cadillac the opportunity to inspect the toolbox in a more appropriate location. But it ignored those offers. For present purposes: No harm, no foul.

Having entirely failed to demonstrate prejudice, Napleton Cadillac's procedural objections all fail.

## V

For all of those reasons, we dismiss Napleton Cadillac's petition for review as to the impression-of-surveillance finding, deny the petition in all other respects, and grant the Board's cross-application for enforcement.

*So ordered.*

RAO, *Circuit Judge*, concurring in part and dissenting in part: Napleton Cadillac discharged mechanics William Russell and David Geisler shortly after a majority of their fellow employees voted to unionize. The National Labor Relations Board found that the discharges constituted unlawful discrimination. While I join the majority in enforcing the Board's other unfair labor practice findings, the discrimination finding cannot be upheld under the Board's precedents. Employer knowledge of an employee's union activity, or a proxy for employer knowledge, is an essential element of a discrimination charge under the National Labor Relations Act ("NLRA"). Because the General Counsel did not attempt to demonstrate that Napleton had knowledge of whether Russell or Geisler participated in union activity, and none of the established exceptions to the employer knowledge element applies here, the Board's finding of discrimination departs from its announced standards. The Board neither acknowledges nor explains this departure, which requires vacating its decision. The majority upholds the Board's finding of discrimination only by glossing over longstanding standards and providing a post hoc judicial justification for the Board's action. Because this approach runs afoul of our precedents and fundamental principles of administrative law, I respectfully dissent from Part III.A of the court's opinion.

I.

The NLRA bars employers from terminating employees "because of union activity." *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1072 (D.C. Cir. 2016) (citing *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 394 (1983)). Section 8(a)(3) prohibits certain unfair labor practices, including discrimination "in regard to hire or tenure of employment or any term or condition of employment" for the purpose of "encourag[ing] or discourag[ing] membership in any labor organization." 29 U.S.C. § 158(a)(3). Such adverse actions also "interfere with, restrain, or coerce employees in the exercise of

the rights guaranteed" by the NLRA in violation of section 8(a)(1). *Id.* § 158(a)(1). The Board analyzes adverse employment actions under the burden shifting framework set out in *Wright Line*, 251 NLRB 1083 (1980), which first requires that the NLRB's General Counsel establish a *prima facie* case of discrimination, and then allows the employer to rebut this evidence by showing that it would have taken the same action regardless of the employee's protected union activity*, id.* at 1089.

Notably absent from the majority's discussion, however, are the well-established elements of the General Counsel's *prima facie* burden. Antiunion discrimination on the part of an employer is unlawful under sections 8(a)(3) and (1) only when supported by "evidence of actual discriminatory intent." *Adv. Life Sys. Inc. v. NLRB*, 898 F.3d 38, 49 (D.C. Cir. 2018). Because an employer must have knowledge of an employee's union activity to discriminate intentionally on that basis, "[a] discharge cannot stem from an improper motivation where the employer is ignorant of the employee's union activity." *Avecor, Inc. v. NLRB*, 931 F.2d 924, 931 (D.C. Cir. 1991). To establish a *prima facie* case of unlawful discrimination, "the General Counsel for the Board must demonstrate that (i) the employee was engaged in an activity protected by 29 U.S.C. § 157, (ii) the employer was aware of that protected activity, and (iii) the protected activity was a motivating factor in the employer's decision to take adverse action." *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (cleaned up). An employer's "general knowledge of union activities" may provide circumstantial evidence that the employer had individualized knowledge of an employee's protected conduct, *Montgomery Ward & Co.*, 316 NLRB 1248, 1253 (1995), but standing alone it does not satisfy the individual knowledge requirement. Employer knowledge of the targeted employee's union activity

therefore remains necessary to conclude that protected activity was a motivating factor in the discharge.[1]

The Board's decision in this case is arbitrary and capricious for a simple reason: the Board excused the requirement that the General Counsel prove either that Napleton discharged employees Russell and Geisler with knowledge of "their individual union activity" or that discriminatory intent could be imputed to Napleton through the longstanding mass-layoff or cover-up exceptions to the actual knowledge requirement. *Napleton 1050, Inc.*, 367 NLRB No. 6, at *1 n.2, *8 (Sept. 28, 2018). Indeed, as the ALJ recognized, the General Counsel's "theory of violation" does not include an argument that Geisler and Russell were discharged "in retaliation for their individual union activity." *Id.*

Neither the Board nor the majority suggests that Napleton had any knowledge of specific individuals' union activity; instead, they attempt to craft a novel "retaliation" exception to *Wright Line*'s employer knowledge requirement. In the decision below, the ALJ asserted that the General Counsel "need not prove" employer knowledge of *any* protected activity by *any* discharged employees if the terminations were meant "to punish the employees as a group to discourage union

---

[1] The Board has consistently treated employer knowledge as a fundamental prerequisite in establishing discriminatory motive. *Mack's Supermarkets*, 288 NLRB 1082, 1101 (1988) (quoting *Bayliner Marine Corp.*, 215 NLRB 12, 12 (1974)); *Electrolux Home Prods., Inc.*, 368 NLRB No. 34, at *3 (Aug. 2, 2019). For example, in *Jo-Del, Inc.*, management knew of general union activity among employees, but the Board did not find that sufficient to establish a discrimination charge. 324 NLRB 1239, 1241, 1243 (1997) ("The absence of evidence establishing knowledge by Respondent of any union activity or affiliation by [the employee] precludes the finding of a violation of [s]ection 8(a)(3) of the Act.").

activity or in retaliation for the protected activity of some." *Id.* (cleaned up). The ALJ found that the terminations violated sections 8(a)(3) and (1) because Napleton knew of and exhibited animus toward the shop employees' unionization drive and took adverse action against Russell and Geisler to punish the entire shop. *Id.* The Board provides no additional analysis on this score, and the majority begins not with the basic test for discrimination claims, but with various statements about general retaliation and punishment. *See, e.g.*, Maj. Op. 17 ("Section 8(a)(3) outlaws punishing the workforce as a whole for its union activity just as strongly as it outlaws punishing particular union supporters.").

Despite the majority's claims, there is no "retaliation" exception to the employer knowledge requirement of an unfair labor practice under sections 8(a)(3) and (1). And we cannot enforce decisions of the Board that ignore elements of an unfair labor practice charge. *See Adv. Life Sys.*, 898 F.3d at 49; *Avecor, Inc.*, 931 F.2d at 931. As the Board conceded at oral argument, no prior decision of the Board found discrimination on similar facts. *See* Oral Arg. Tr. 21:18–19 ("No, Your Honor. I was not able to uncover a situation exactly like the one at bar."); *id.* at 23:18 ("This is certainly a unique case. It's very novel."). None of the cases cited by the Board has excused the employer knowledge element when *not a single adversely treated worker* was known to have engaged in protected activity. *Cf. Napleton*, 367 NLRB No. 6, at *8 & n.20; NLRB Br. 21–22. Instead, the Board's precedents contain only two ways around the employer knowledge requirement as to specific individuals. Neither fits the circumstances of this case.

First, the "mass-layoff" exception excuses the requirement of proving the employer knew about each discharged worker's protected activity when the discharge was (1) part of a "mass layoff" and (2) undertaken "for the purpose of discouraging

union activity." *Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162, 1168 (D.C. Cir. 1993) (quoting *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1180 (6th Cir. 1985)). As we explained in *Davis Supermarkets*, a "mass layoff" occurs when an employer dismisses a class of employees that includes both known union sympathizers and others of unknown sympathies. *Id.* at 1168–69. The mass-layoff exception allows imputing employer knowledge of union activity by one member of the class to others subject to the same adverse action. So long as the employer knew that some class members engaged in protected activity and the employer acted to discourage further union activity, a mass termination can erode workers' statutory rights just as effectively "as adverse action taken against only known union supporters." *Id.* at 1169 (quoting *Birch Run*, 761 F.2d at 1180).

Courts have accordingly upheld a *prima facie* case of discrimination when the adversely treated class includes at least some known union supporters and the adverse treatment was unlawfully motivated. *See id.* at 1168–69 (employer sought to "get[] rid of the troublemakers and the people with attitude problems," including those known to have engaged in union activity); *Birch Run*, 761 F.2d at 1179–81 (at least two and up to six of thirteen terminated employees were known union advocates); *NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 510 (4th Cir. 1991) (two of three terminated employees were known union advocates, but all three were subject to the employer's "undiscerning axe"). The Board has always required proof that the employer knew of protected activity by at least some members of the adversely treated class, even when the employer lacked knowledge as to each individual member.[2] Thus, the mass-layoff exception recognizes that the

---

[2] *See, e.g.*, *Electro-Voice, Inc.*, 320 NLRB 1094, 1095 n.4, 1110 (1996) (employer was aware of several terminated employees' union

Board need not demonstrate knowledge as to each impacted employee; however, this does not create a general "retaliation" standard that requires showing only animus by the employer, rather than knowledge of protected activity. The majority errs by adopting a standard that makes an employer's general motivation to harm unions—rather than specific motivation to punish an individual's union activity—sufficient to make out a discrimination claim. *See* Maj. Op. 17–21. And in any event, it is far-fetched that laying off only two employees could constitute a mass layoff.

The second exception excuses proof of knowledge as to each wronged employee when an employer adversely treats neutral employees along with known union supporters in order to cover up evidence of discriminatory motive. *Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1105 (D.C. Cir. 2019); *see also Bay Corrugated Container*, 310 NLRB 450, 451 (1993) ("The Board has held that … the discharge of a neutral employee in order to facilitate or cover up discriminatory conduct against a known union supporter is violative of [s]ection[s] 8(a)(3) and (1) of the Act."). The Board need not prove the employer's knowledge of union activity by the neutral employees because they were treated adversely as part of the employer's plan to discriminate against known union supporters. As with mass-layoff cases, the cover-up exception allows the Board to sanction intentional

---

activity and conducted a mass layoff "in order to punish the employees as a group"); *J.T. Slocomb Co.*, 314 NLRB 231, 241–43 (1994) (direct and circumstantial evidence employer knew members of terminated class supported the union); *ACTIV Indus., Inc.*, 277 NLRB 356, 356 n.3, 373–74 (1985) (circumstantial evidence revealed employer targeted some employees because of their protected activity even though it was the "mass discharge, and not [the] selection of employees for the discharge, that is unlawful").

discrimination in the form of actions and policies that sweep in neutral employees. *See Contractors' Lab. Pool, Inc. v. NLRB*, 323 F.3d 1051, 1057 (D.C. Cir. 2003) (Rules enacted "for the very purpose of excluding applicants who had recently been covered by union contracts" may be discriminatory "even if the operation of the rule excluded nonunion applicants as well."). In this situation, the Board retains the burden of proving the employer's knowledge of union support by employees targeted by the discriminatory scheme.[3]

Both the mass-layoff and cover-up exceptions reflect evidentiary inferences grounded in the Board's labor law expertise. When an antiunion employer adversely treats a known union supporter through an action that impacts multiple employees, the Board infers that the other employees are also victims of discrimination. In other words, one tainted apple spoils the barrel. Yet the Board must still prove employer knowledge as to at least one adversely treated employee because knowledge remains an essential element of the Board's *prima facie* case. Although the Board is permitted to make certain inferences about an employer's conduct and intentions, the inferential chain must begin with an actual evidentiary foundation: knowledge of at least one employee's union activities. *See Avecor*, 931 F.2d at 931 (noting that inferences drawn from expertise may "reduce[] the weight of evidence necessary to impute knowledge … but … do[] not wholly eliminate the need for evidence").

---

[3] *See, e.g.*, *Metro-West Ambulance Serv., Inc.*, 360 NLRB 1029, 1055–56 (2014) (employer was aware of protected activity by employee fired at the same time as neutral employee); *Bay Corrugated Container*, 310 NLRB at 451 (same); *Dawson Carbide Indus.*, 273 NLRB 382, 389 (1984) (same).

While the mass-layoff and cover-up exceptions obviate the General Counsel's burden of demonstrating knowledge as to *all* impacted employees, they do not create the general "retaliation" standard implicitly adopted by the Board (and justified by the majority). Rather, these narrow exceptions allow the Board to establish that a particular employee of unknown union sympathy was discharged "because of" a cover up or mass layoff intended to target those with known union sympathies. These two exceptions are consistent with the General Counsel's requirement to satisfy the three elements of the traditional *prima facie* case.

Here, the General Counsel never argued that Napleton knew of protected activity by Russell or Geisler, and no known union supporter was subject to the same adverse employment action. *See Napleton*, 367 NLRB No. 6, at *8. With no showing of individualized knowledge, the Board's finding of discrimination allows the exceptions to swallow the rule. This is not a straightforward application of the law; it is a sea change. Agencies may announce new policies within the scope of their statutory authority while deciding individual cases, but they must do so explicitly and explain why the policy is reasonable and consistent with the Act. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In a case like this, where the Board neither acknowledged nor justified its novel "retaliation" exception, we must vacate the discrimination finding and remand for additional reasoning.

## II.

With no further explanation from the Board, the majority offers a lengthy justification for why this novel "retaliation" exception is consistent with judicial precedent, the text of sections 8(a)(3) and (1), and the *Wright Line* standard. *See* Maj. Op. 14–23. The majority's reasoning, however, cannot rectify

the Board's failure to explain or acknowledge this novel exception. *See SEC v. Chenery Corp.*, 318 U.S. 80, 88–89 (1943); *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 283, 286–87 (D.C. Cir. 2020). The Board, and not this court, is tasked with developing and applying expert judgment to implement the Act. Our deference to the Board's statutory interpretation when "rational and consistent with the Act" means that we cannot supplant the agency's expertise when we are left without a reasoned explanation. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 364 (1998) (cleaned up). Nor is this a situation where we may repair the Board's decision because its "path may reasonably be discerned." *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 483 (D.C. Cir. 2020) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). Rather, here the Board has "entirely fail[ed] to consider an important aspect of the problem" by excusing an essential element of an unfair labor practice charge without acknowledgement or justification. *Id.* at 483 (quoting *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017)).

Even if courts had the authority to administer the NLRA in the first instance, the majority's justification for a "scapegoating" exception would fail on its own terms. Maj. Op. 27 n.3. Relevant precedents and the text of sections 8(a)(3) and (1) cannot support such a sweeping limitation on the employer knowledge requirement. The majority relies on generalized employer intent or animus, but bad acts of the employers are not sufficient to make out a case for discrimination under the Act, which requires intentional adverse action against an employee *because of* the employee's protected conduct. The majority's broad retaliation standard amounts to a rule that, so long as some employees are engaged in protected activity with the employer's knowledge, the employer can be held liable for adverse action taken against any employee. But this court and

the Board have always required that the employer have knowledge that at least one adversely treated employee engaged in protected activity before holding the employer liable for discrimination against an employee not engaged in protected activity. *See, e.g.*, *Davis Supermarkets*, 2 F.3d at 1168.

In filling in for the Board's lack of reasoning, the majority misconstrues precedents applying the mass-layoff and cover-up exceptions described above. I agree that motive is the lynchpin in discrimination cases, not "the number of employees affected" by the employer's actions. Maj. Op. 20. But this does not excuse the General Counsel from proving that some member of the terminated class was known by the employer to be a union supporter and then subjected to intentional discrimination. The court in *Frigid Storage*, for example, found the termination of two known union supporters alongside a third neutral employee to permit the Board's inference of knowledge as to all three employees. 934 F.2d at 508–10. The employer "wield[ed] an undiscerning axe" by striking the neutral employee, but it was nevertheless essential that the axe was directed in part at *known* union supporters.[4] *Id.*

---

[4] The majority's reliance on *Frigid Storage* is misplaced, Maj. Op. 24–26, because *Frigid Storage* is a garden variety cover-up case. After establishing that the discharge of a known union supporter was unlawful, the Board *then* considered the discharge of the neutral employee. *Econ. Foods*, 294 NLRB 660, 661–62 (1989), *aff'd sub nom. Frigid Storage*, 934 F.2d 506 (4th Cir. 1991). In other words, the Board followed the typical process in cover-up cases, using the discharge of pro-union employees to support an evidentiary inference that the neutral employee was also discharged illegally. This is reinforced by the fact that the cases cited by the court in *Frigid Storage* involved an employer who knew of the pro-union sympathies of at least one of the adversely treated employees. *See Birch Run Welding & Fabricating*, 761 F.2d at 1179 ("The evidence

at 510; *accord Novato Healthcare*, 916 F.3d at 1105; *Birch Run*, 761 F.2d at 1179–81.

The majority likewise expands the Board's decision in *W.E. Carlson Corp.*, 346 NLRB 431 (2006), reading it to abrogate the employer knowledge requirement. Maj. Op. 18–19, 24–26. Yet the Board did no such thing. Rather, in that case, the employer froze wage increases to discourage further organizing efforts by several known union supporters. The impact of the freeze first fell exclusively on an employee of unknown sympathies. But the "undiscerning axe" was aimed at the known union supporters and would have soon impacted them as well. 346 NLRB at 432–34, 442. The Board simply recognized that a facially neutral policy can be unlawfully discriminatory where the facts demonstrate that the employer had knowledge that its actions would impact union supporters. *See, e.g.*, *Contractors' Lab. Pool*, 323 F.3d at 1057. The Board could rationally have determined that these facts fell within the typical cover-up exception, in which the employer intends to hurt neutral employees along with known union supporters. It makes no difference that a neutral employee was hurt first, for as the majority and I agree, the focus of the Board's precedents is on the *employer*'s knowledge and motive.[5]

---

in the present case shows that Birch Run knew of Humes' and Schmidt's pro-union sentiments before the lay-offs."); *Merchants Truck Line, Inc. v. NLRB*, 577 F.2d 1011 (5th Cir. 1978) ("On June 25, Patterson discharged the five junior employees … four of whom were known to him to be union sympathizers."); *Majestic Molded Products, Inc. v. NLRB*, 330 F.2d 603, 606 (2d Cir. 1964) ("A power display in the form of a mass lay-off … satisfies the requirements of § 8(a)(3) to the letter even if some white sheep suffer along with the black.").

[5] Contrary to the majority, the Board's decisions do not interpret *W.E. Carlson* as eliminating the employer knowledge requirement.

Because some cases have murky reasoning, the majority infers that we may do away with the individual knowledge requirement in discrimination claims. Maj. Op. 17–21, 27–29. Yet the majority can cite no case for this proposition, which is directly at odds with the basic framework of discrimination claims. Employer knowledge of individuals' union activity is simply part of the Board's discrimination framework, and the failure to reiterate this in every case does not eviscerate the individual knowledge requirement. After all, why have mass-layoff or cover-up exceptions if general knowledge of union activity suffices?

Prior to this case, the Board consistently required employer knowledge and rejected reliance on employer animus drawn from circumstantial evidence. Indeed, the majority today propounds a rule that the Board has numerous times declined to create or enforce. For instance, in *In re Amber Foods, Inc.*, the Board reversed an ALJ's finding of a violation because there was "not a scintilla of record evidence that the Respondent believed or, at the very least, even *suspected* that [the discharged employee] was engaged in union activity at the time she was warned and discharged, although the Respondent knew generally, by March 31, that its employees had contacted the Union." 338 NLRB 712, 714 (2002); *see also Gruma Corp.*,

---

For example, in *Gruma Corporation*, decided the year after *Carlson*, the Board dismissed allegations of a section 8(a)(3) violation because the employer had no knowledge of the discharged employee's protected activity, even though it knew of its employees' union activities in general. 350 NLRB 336, 338 (2007). The majority tries to distinguish *Gruma* because it did not involve an argument that the employee was discharged as retribution for union activity by the workforce as a whole. Maj. Op. 25 n.2. But that is precisely the point. All the facts were in place for such a retaliation argument, and for a holding of discrimination based on it, but the Board did not even explore the argument—presumably because it is not the law.

350 NLRB 336 (2007) (finding no § 8(a)(3) violation because the employer had no knowledge of the discharged individual's protected activity, despite knowing of union activity generally).

Furthermore, the majority's general animus test runs against the statutory text. On its face, section 8(a)(3) requires at least two elements: "discrimination" on the part of an employer and a motive of encouraging or discouraging union membership. 29 U.S.C. § 158(a)(3). "Discrimination" means "[t]o make a difference in treatment or favor (of one as compared with others)." *Discrimination*, Webster's New International Dictionary (2d ed. 1954); *see also Discrimination*, Black's Law Dictionary (11th ed. 2019) ("Differential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored."). An employer cannot violate section 8(a)(3) unless it targets employees for an impermissible reason: that they have participated in union-related activities. This obviously requires the employer to know that the employee participated in such activities, as the case law amply demonstrates. *See, e.g.*, *Goldtex, Inc. v. NLRB*, 14 F.3d 1008, 1011 (4th Cir. 1994) ("In this case, the Board has failed to demonstrate the most basic element of an unlawful discharge—namely, that the employer was even aware of the discharged employees' protected activities.").

Moreover, the majority's expansive reading of section 8(a)(3) eliminates longstanding differences between intentional discrimination charges under sections 8(a)(3) and (1) and other unfair labor practices under section 8(a)(1). Unlawful threats, for example, can be found based on any employer conduct that "interfere[s] with, restrain[s], or coerce[s]" employees, even if unintentional. 29 U.S.C. § 158(a)(1); *Adv. Life Sys.*, 898 F.3d at 44–45. By contrast, the

14

Board has always required employer intent to make out a charge of discrimination.

Finally, the majority reads a "retaliation" theme into *Wright Line* that is absent from the Board's discussion of the standard. *See* Maj. Op. 16–17. The Board in *Wright Line* designed a framework to "determine the relationship, if any, between employer action and protected employee conduct." 251 NLRB at 1089. In doing so, however, the Board explicitly understood that the potentially unlawful actions were those taken against the employee engaged in protected activity and not against other employees. *See id.* at 1083 ("In resolving cases involving alleged violations of [s]ection 8(a)(3) and, in certain instances, [s]ection 8(a)(1), it must be determined, *inter alia*, whether an employee's employment conditions were adversely affected by his or her engaging in union or other protected activities."); *id*. at 1090 ("It is undisputed that Respondent was well aware of [the discharged employee's] sympathies and activities."). Improper motivation does not become discrimination until combined with an act intentionally taken against known protected activity.

As explained in Part I, the Board's decision obfuscates rather than frankly acknowledges a change in the legal standard. The majority tries to connect the dots, but in doing so misapplies the Board's longstanding precedents and reinforces this anomalous decision, "preventing both consistent application of the law by [ALJs] and effective review of the law by the courts." *Allentown Mack*, 522 U.S. at 375. The majority also undercuts a foundational principle of administrative law, which requires a reasoned explanation from *the agency* for a change in legal standards.

Evidence that Napleton terminated Russell and Geisler "to punish its employees' decision to vote for union

representation," Maj. Op. 22, says nothing about those particular employees' union activity or Napleton's knowledge of it. The General Counsel did not even argue that Napleton had knowledge of these employees' actions. *Napleton 1050, Inc.*, 367 NLRB No. 6, at \*8 (Sept. 28, 2018). Under the precedents of the Board, and of this court until today, that lapse constitutes a per se failure to make out a retaliatory discharge claim. The majority's contrary conclusion flies in the face of these precedents and creates new legal standards absent any reasoned decisionmaking from the Board.

\*   \*   \*

The Board failed to hold the General Counsel to the *prima facie* burden of proving discriminatory animus was a motivating factor in Napleton's decision to fire Russell and Geisler. Further, the Board departed from precedent by excusing this failure under a novel legal theory for which it offered no justification. Because our court cannot fill in the blanks left by the agency, I would vacate the discrimination finding and remand to the Board for further consideration.